Filed 6/1/16

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>LUKE GARLINGER,<br><br>      Defendant and Appellant. | C074480<br><br>(Super. Ct. No. 11F03158) |

APPEAL from a judgment of the Superior Court of Sacramento County, Kevin J. McCormick, Judge.  Affirmed.

Jennifer a. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Julie A. Hokans, and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]     Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the discussion.

1

We, as a society, have been communicating wirelessly for more than a century. (Fessenden, *Wireless Telephony* in Transactions of the American Institute of Electrical Engineers (1908) pp. 578-581.) While technology has advanced considerably since the first signals were transmitted over the air, we conclude in the published portion of this opinion that expert testimony explaining a cell phone signal received by a certain side of a cell tower must have come from that side of the tower and in the general vicinity of the tower does not describe a new scientific technique subject to the standard set forth by our Supreme Court in *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) for admitting the results of such techniques.

Defendant Luke Garlinger robbed a motel clerk at gunpoint and threatened to shoot her if she did not comply with his demands. He was convicted by jury of second degree robbery and making a criminal threat, and also found to have personally used a firearm during the commission of the crimes. The trial court sentenced defendant to serve an aggregate determinate term of 13 years in state prison and imposed other orders.

On appeal, defendant (1) contends his trial counsel provided constitutionally deficient assistance by failing to object to expert testimony concerning the general location of defendant's cell phone in relation to various cell towers to which that phone connected during the hours before and after the robbery, arguing the testimony was inadmissible under the *Kelly* standard and Evidence Code sections 801 and 802;[1] and (2) asks us to review the trial court's determination, after conducting an in camera review

---

[1]    Undesignated statutory references are to the Evidence Code.

2

of a certain detective's personnel files under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), that the files contained no discoverable material.[2]

As we have already noted, we reject defendant's *Kelly* challenge in the published portion of this opinion. (*Kelly, supra,* 17 Cal.3d 24.) We also conclude in that portion of the opinion the expert's testimony was not rendered inadmissible by sections 801 and 802. Thus, defendant's trial counsel was not ineffective for failing to make a futile objection to the evidence. In the unpublished portion of the opinion, we explain that after reviewing the contents of the sealed record relating to defendant's *Pitchess* motion, we conclude the trial court did not abuse its discretion in determining the personnel files contained no discoverable material. Accordingly, we affirm the judgment.

## FACTS

In March 2011, Evelyn Porlas worked as the night desk clerk at the Extended Stay motel in Elk Grove. Two sets of glass doors separated the motel's lobby from the front of the motel. At night, the outer doors remained unlocked, while the inner doors required a card key for access to the lobby. A prospective guest trying to check in after the inner doors were locked would call the front desk from a phone outside these doors.

The night of the robbery, after Porlas finished up some laundry in another room, she came to the front desk and found defendant in the lobby. He was wearing cargo pants, a brown jacket, a stockcar racing cap, dark sunglasses, and gloves. Porlas asked defendant how he got in the lobby. Defendant said someone let him in and asked for a room. Porlas began the process of renting him a room for the night. When she asked for identification and a credit card, defendant fumbled through his pockets for a moment and then told her to open the door behind the front desk. Porlas refused. Defendant again

---

[2]     While *Pitchess* has been superseded by statute, motions for discovery of law enforcement officer personnel files are still referred to as *Pitchess* motions. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225.)

told her to open the door.  Porlas again refused.  Defendant then opened his jacket to reveal a handgun in a shoulder holster and threatened to shoot Porlas if she did not open the door.  Afraid for her life, Porlas opened the door.  Inside the room, defendant pointed to a piece of luggage and told Porlas to open it.  When Porlas was unable to open the luggage, defendant asked to be taken to the cash register.  Porlas complied and opened the register, which contained only change.  Defendant then asked Porlas where the cash was kept.  Porlas took defendant to the safe, but told him she did not have the combination.  He instructed her to try to open it anyway, which she did.  After a few randomly selected combinations did not open the safe, Porlas heard someone knocking on the inner lobby doors.  At this point, Porlas told defendant she needed to let the person in and ran towards the doors, crouching as she ran because she thought defendant might try to shoot her in the head.

The person knocking on the lobby doors was a motel guest whose card key was not working properly.  After calls to the front desk went unanswered, she decided to knock.  Porlas made a "finger-gun" hand signal as she came out of the back room and made her way to the doors.  Once outside, Porlas said she was being robbed.  She was "distraught" and "extremely scared, shaking."  Another guest, who was outside smoking a cigarette when Porlas exited the lobby, called 911.  While this guest was on the phone, he saw a man who generally matched defendant's description exit the motel out of a different door carrying "what looked to [him] like a laptop-type container," walk across the parking lot, and get into the back seat of a faded blue Honda Accord.  The car then drove out of the parking lot with its lights off.

Police officers arrived a short time later and took Porlas's statement.  They also contacted the motel's general manager by phone, prompting him to come down to the motel.  The manager noted a small safe that had nothing inside was missing from the back room.  The manager also provided officers with the motel's security camera footage.  Using still images from this footage, Detective Mark Bearor created a

4

crime bulletin and had the police department's public information officer issue a press release.

At some point, Jonathan Bresciani saw the crime bulletin online, recognized defendant in the footage, and showed the bulletin to defendant's long-time girlfriend, Rachelle Stratton. Stratton and defendant lived together in the north Natomas area of Sacramento. Their relationship "wasn't strong at the time" due to the fact defendant was using and selling drugs, specifically marijuana and methamphetamine. Defendant spent a lot of time hanging out and doing drugs with friends in the garage, often sleeping out there. Bresciani was one of these friends, or as defendant referred to them, "drug acquaintance[s]." Bresciani had also stayed at the Extended Stay motel in Elk Grove several times before the robbery and had defendant over to visit during many of those stays. When Bresciani showed Stratton the crime bulletin, she agreed the man in the footage looked like defendant. Bresciani and Stratton each contacted the police department and gave separate statements to Detective Bearor.

A photographic lineup was prepared and shown to Porlas. While she paused on defendant's photograph longer than any of the others, Porlas did not identify anyone in the lineup. Porlas did, however, positively identify defendant at trial as the man who robbed her.

In addition to Porlas's in-court identification of defendant and the out-of-court identifications made by Stratton and Bresciani based on the surveillance video, the following circumstantial evidence also connected defendant to the crime. Stratton testified she owned a light blue Honda Accord defendant occasionally took without asking. Stratton also testified defendant owned a handgun and shoulder holster. The gun was purchased by both Stratton and defendant for protection and was registered in Stratton's name. The day before Stratton's house was searched by police, she told Detective Bearor this gun was missing. When police executed a search warrant on the house the next day, they did not find the gun. However, several months later, Stratton

5

claimed to have found the gun in her closet, which was an area the officers had previously searched, and handed the gun over to Detective Bearor. Defendant was in custody at the time Stratton turned the gun over to the detective, having been arrested the day after the house was searched. The same day Stratton turned the gun over, she and defendant discussed the matter in a jailhouse phone call that was recorded and played for the jury. In the phone call, defendant asked Stratton whether she "wiped it down hella good." In another jailhouse phone call, defendant implored Stratton to go along with his "alibi" and to tell the district attorney she had sex with defendant the night of the robbery, adding, "just tell her that story, okay?" Bresciani also testified that while he and defendant were hanging out, defendant "brought up that . . . he needed money and thought that going to motels and hitting the safes would be a quick, easy [way to get] money . . . ."

Finally, as we explain in greater detail immediately below, cell phone records revealed defendant's calls were made from his cell phone from the general vicinity of his house in the north Natomas area of Sacramento to the general vicinity of the Extended Stay motel in Elk Grove the night of the robbery, connecting to a cell tower near the motel about 30 minutes before and just after the robbery, and then returned to the Natomas area about an hour later.

DISCUSSION

**I**

*Admission of Expert Cell Phone Testimony*

Defendant contends his trial counsel provided constitutionally deficient assistance by failing to object to expert testimony concerning the general location of his cell phone in relation to various cell towers to which that phone connected during the hours before and after the robbery, arguing such testimony was inadmissible under the *Kelly* standard for admitting the results of new scientific techniques and sections 801 and 802. We disagree.

6

## A.

### *Additional Background*

Detective Bearor testified as an expert in analyzing cell phone call detail records. As the detective explained, call detail records are maintained by cell phone companies and include, among other things, the time and duration of each call, the cell tower the phone connected to at the initiation of the call, the cell tower the phone was connected to at the termination of the call, and the "azimuth" (or compass orientation) of the particular antenna face of the cell tower the phone connected to at each of those points in time. Because cell towers typically have three antenna faces (or sectors) arranged in triangular fashion, each sector will receive signals from about a 120-degree area. Thus, the azimuth enables the detective to determine from which general direction a particular call connected to the tower.[3]

With respect to the process, Detective Bearor explained that once a warrant is obtained for these records, the custodian of records for the particular cell phone company compiles a spreadsheet containing the foregoing information and sends that spreadsheet to the department. The custodian also sends information regarding the location of each of the company's cell towers and a "tip sheet" with instructions on how to interpret the information in the records. The detective then creates his own spreadsheet from the one received, rendering the information into a more user-friendly format. He also uses either an outside contractor or the City of Elk Grove's (City) mapmaking division to plot the locations of the relevant cell towers, i.e., the towers connected to during the time period he is investigating, and other relevant locations on a map. The detective then verifies that the locations plotted on any maps generated by others are accurate.

---

[3]    The detective also explained that occasionally a cell tower will have only one antenna that receives signals from all directions. Other towers have six sectors.

Regarding his qualifications as an expert, Detective Bearor testified he completed the basic investigative training course offered by the Commission on Peace Officer Standards and Training, completed additional investigative training courses, and, beginning in 2008, attended a yearly symposium that included a section on cell phone record analysis. This section enabled the detective to "stay up to date talking to the industry leaders that provide this data to law enforcement." The detective also remained up to date on cell phone technology by reading various articles on the subject. Since becoming a detective in 2001, he obtained and analyzed cell phone call detail records "[n]o less than 40" times. Prior to attending the yearly symposium section on cell phone record analysis, the detective was trained how to analyze such records by others in the department and also contacted the custodian of records for various cell phone companies if he had trouble understanding the records he received. Aside from analyzing these records in his own cases, the detective has also been asked to assist outside agencies in analyzing such records in other cases. Finally, the detective explained he had testified as an expert in analyzing cell phone call detail records in four cases since 2003. Based on these qualifications, the detective was accepted as an expert in cell phone call detail record analysis.

Turning to the records received in this case, Detective Bearor testified he received defendant's call detail records covering the week of the robbery from Sprint's custodian of records. He then used the process described above, focusing on the day of and day after the robbery. The detective was careful to point out these records did not enable him to pinpoint the phone's exact location at any given time, but only enabled him to determine "the vicinity of the phone . . . in relationship to a cell site, whether it's north of the site, southwest of a site, southeast of a site and such."

The robbery occurred shortly before 11:00 p.m. on March 10, 2011. Detective Bearor's analysis of the call detail records for defendant's phone before and after this time revealed the following: At 7:14 p.m. that night, defendant's cell phone connected to

8

the southwest sector of a cell tower located on West Delano Street in the north Natomas area of Sacramento at the beginning of a brief call, and was connected to the north sector of a cell tower located on Sorento Road, also in the north Natomas area, at the termination of that call. Thus, the cell phone must have been located southwest of the West Delano tower and north of the Sorento tower during the call. Defendant's house was located in that general vicinity. At 8:18 p.m., defendant's cell phone connected to the north sector of a cell tower located on Franklin Boulevard in the south Sacramento area. At 8:22 p.m., the cell phone again connected to the same sector of that tower. At 8:31 p.m., the cell phone connected to the southwest sector of a cell tower located on Stockton Boulevard. Thus, by 8:31 p.m., the cell phone had moved south from the general vicinity of Natomas to the general vicinity of south Sacramento, somewhere to the southwest of the Stockton tower. At 10:22 p.m., less than an hour before the robbery, defendant's cell phone connected to the southwest sector of a cell tower located on High Tech Court in Elk Grove. The Extended Stay motel was located in that general vicinity. At 11:03 p.m., just after the robbery, the cell phone again connected to the same sector of that tower. Then, at 12:20 a.m. on March 11, the cell phone connected to the southwest sector of a cell tower located at One Sports Parkway, i.e., Sleep Train Arena, in Natomas. And by 7:43 a.m., the cell phone connected to the southeast sector of a cell tower located on Elkhorn Boulevard, placing the phone again in the general vicinity of defendant's house.

Defendant's trial counsel did not object to the foregoing testimony, forfeiting the contention on appeal that the testimony was inadmissible under the *Kelly* test or sections 801 and 802. We turn now to the question of whether this failure amounted to ineffective assistance of counsel.

9

**B.**

*Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.*) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendant has not carried his burden. Defense counsel's failure to object to the cell phone testimony cannot amount to deficient performance where such an objection would have been futile. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 616 [failure to object to the admission of evidence is not ineffective assistance where "there was no sound legal basis for objection"]; see also *People v. Diaz* (1992) 3 Cal.4th 495, 562 [failure to object to the admission of evidence is not ineffective assistance where "any objection . . . would have been futile"].) Such is the case here.

In California, the *Kelly* test governs "the admission of expert testimony regarding new scientific methodology." (*People v. Leahy* (1994) 8 Cal.4th 587, 591.)[4] Under that test, the proponent of such evidence must establish: (1) the new methodology is reliable by showing it has gained general acceptance in the relevant scientific community; (2) the witness furnishing the testimony is qualified as an expert to give an opinion on the subject; and (3) correct scientific procedures were used in the particular case. (*Kelly*, *supra*, 17 Cal.3d at p. 30.) However, as our Supreme Court has explained, this test "is applicable only to 'new scientific techniques,'" that is, "'to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.'" (*People v. Leahy*, *supra*, 8 Cal.4th at p. 605, quoting *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*).)

For example, in *Stoll*, *supra*, 49 Cal.3d 1136, a molestation case, our Supreme Court held the *Kelly* test did not apply to proposed expert psychological testimony, based in part on the administration of certain psychological tests, that one of the defendants did not possess "any 'pathology' in the nature of 'sexual deviation.'" (*Stoll*, *supra*, 49 Cal.3d at pp. 1146-1147.) The court first explained the "narrow 'common sense' purpose" behind the *Kelly* rule is "to protect the jury from techniques which, though 'new,' novel, or '"experimental,"'" convey a '"misleading aura of certainty."' [Citations.]" (*Id.* at pp. 1155-1156.) Under *Kelly*, the jury must be protected from such techniques until "the pertinent scientific community no longer views them as experimental or of dubious validity," particularly where "the unproven technique or procedure appears in both name

---

[4] Previously referred to as the *Kelly/Frye* test, after the California Supreme Court's decision in *Kelly* and the seminal federal decision in *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, the latter decision was held to have been abrogated by rule 702 of the Federal Rules of Evidence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 (*Daubert*). Thereafter, in *Leahy*, *supra*, 8 Cal.4th 587, the California Supreme Court held the *Kelly* test remained the rule in California.

and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible." (*Id*. at p. 1156; see, e.g., *People v. Leahy*, *supra*, 8 Cal.4th at p. 606 [horizontal gaze nystagmus (HGN) test for probable intoxication subject to *Kelly* test as a new scientific technique]; see also *People v. Shirley* (1982) 31 Cal.3d 18, 51-52 [listing cases in which the *Kelly* test has been applied to polygraph examinations, "truth serum," experimental systems of blood typing, voiceprint analysis, identification of human bite marks, and microscopic identification of gunshot residue particles].) The *Stoll* court also acknowledged the *Kelly* test "has been applied to less tangible new procedures which carry an equally undeserving aura of certainty," citing *Shirley*, in which the court applied the test to bar the admission of "'post-hypnotic' testimony of a rape complainant," but explained that "absent some special feature which effectively blindsides the jury, expert testimony is not subject to *Kelly/Frye*." (*Stoll*, *supra*, 49 Cal.3d at pp. 1156-1157.) The court then concluded the expert psychological testimony proffered in *Stoll* raised none of the concerns underlying the *Kelly* test, explaining: "The methods employed are *not* new to psychology or the law, and they carry no misleading aura of scientific infallibility." (*Id*. at p. 1157.)

Similarly, in *People v. Clark* (1993) 5 Cal.4th 950 (*Clark*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, our Supreme Court held expert testimony regarding blood spatter analysis was not subject to the *Kelly* test, explaining the admissibility of blood spatter testimony predated the *Kelly* decision and "neither the experiments conducted in connection with such analysis nor the principles underlying it produce an 'aura of scientific infallibility.' Rather, it is a matter of common knowledge, readily understood by the jury, that blood will be expelled from the human body if it is hit with sufficient force and that inferences can be drawn from the

manner in which the expelled blood lands upon other objects." (*Clark*, *supra*, 5 Cal.4th at p. 1018.)

Moreover, in *People v. Nolan* (2002) 95 Cal.App.4th 1210 (*Nolan*), our colleagues at the Second District Court of Appeal explained the *Kelly* test "applies to new methodologies," not to "new devices [that] implement established scientific methods." (*Id*. at p. 1215.) Holding the *Kelly* test did not apply to testimony regarding drug test results supplied by a new type of urinalysis device, the court stated: "Urinalysis is not new. It is a medically accepted and widely used method of drug testing. [Citation.] 'It has been routinely used in California courts . . . .' [Citation.]" (*Id*. at p. 1214.) The court also rejected the argument that the new device "may not be accurate," explaining the defendant could have cross-examined the witness concerning the accuracy of the new device or called an expert witness to challenge the device's accuracy. (*Id*. at p. 1215; see also *Stoll*, *supra*, 49 Cal.3d at p. 1159 ["issues of test reliability and validity may be thoroughly explored on cross-examination" or by calling "another expert of comparable background" to challenge the methods employed].)

Here, while cell phones are relatively new devices, the methodology is not new. Cell phones operate like "sophisticated radios" by sending and receiving a radio signal to and from a cell tower and base station in their general vicinity. (Kinder, *The Physics of Cell Phones* (Apr. 7, 2003) <http://www.yale.edu/ynhti/curriculum/units/2003/4/03.04.07.x.html> [as of May 16, 2016].) The area of the particular tower's coverage is known as a "cell." As the cell phone user moves from cell to cell, the wireless company transfers the call to the new cell's tower and base station. (*Ibid*.) As previously stated, the transmission of radio signals from one place to another is a technology that has been around for more than a century. (Fessenden, *Wireless Telephony*, *supra*, at pp. 578-581.) There is nothing new or experimental about this technology. Nor is there anything dubious about science's understanding of radio waves; as relevant here, they generally travel in a straight line.

13

(See Encyclopedia Britannica <http://www.britannica.com/technology/radio-technology> [as of May 16, 2016].)  Thus, determining the general location of a cell phone based on which sector of the particular cell tower to which that phone's signal connected cannot be considered a "new scientific methodology."  (*People v. Leahy*, *supra*, 8 Cal.4th at p. 591.)  This is all Detective Bearor purported to do in his testimony.

We further note such testimony is routinely admitted in the trial courts of this state without any suggestion the *Kelly* test applies.  (See, e.g., *People v. Zavala* (2013) 216 Cal.App.4th 242, 248 [cell phone call detail records admitted at trial and held on appeal to be admissible under the business records exception to the hearsay rule; no challenge to the admission of this evidence under *Kelly, supra,* 17 Cal.3d 24]; *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1544-1545, [testimony regarding call detail analysis admitted at trial; no challenge to the admission of this evidence under *Kelly*]; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1016-1017, 1021-1023, 1027-1028 [testimony regarding call detail analysis admitted at trial and contributed to the substantial evidence held to support the defendant's convictions; such evidence was also held to have corroborated a certain accomplice's testimony; no challenge to the admission of this evidence under *Kelly*]; *People v. Walker* (2006) 139 Cal.App.4th 782, 791 & fn. 5 [call detail records admitted at trial were noted to have been inconsistent with the defendant's alibi; no challenge to the admission of this evidence under *Kelly*].)  Thus, not only is the methodology not new to science, neither is it new to the law.  (*People v. Leahy*, *supra*, 8 Cal.4th at p. 605 [*Kelly* test is applicable only to "'that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law'"].)

Nor would Detective Bearor's testimony have carried a "misleading aura of scientific infallibility."  (*Stoll*, *supra*, at p. 1157.)  He did not purport to be able to determine the precise location of the phone.  Nor did he testify cell phone signals always connect to the closest tower.  However, in order to connect to a particular tower,

14

the cell phone would have to be located within the coverage area of that tower and in the direction of the particular sector's coverage. The detective did not define the coverage area of any given cell tower. Instead, he testified simply in terms of which general direction the phone was located in relation to the particular tower and whether or not a certain landmark, e.g., the Extended Stay motel, was in that general area. We believe the jury was capable of evaluating such testimony without being "blindside[d]." (*Ibid*.)

Nevertheless, relying on a federal district court decision from Illinois, *United States v. Evans* (N.D.Ill. 2012) 892 F.Supp.2d 949 (*Evans*), defendant argues Detective Bearor's testimony is analogous to the "granulization theory" testimony found by that court to lack sufficient reliability under *Daubert*, *supra*, 509 U.S. 579. (*Evans*, *supra*, 892 F.Supp.2d at pp. 955-957.) We disagree. The testimony sought to be admitted in *Evans*, a kidnapping case, was described as follows: "To determine the location of a cell phone using the theory of granulization, Special Agent Raschke first identifies (1) the physical location of the cell sites used by the phone during the relevant time period; (2) the specific antenna used at each cell site; and (3) the direction of the antenna's coverage. He then estimates the range of each antenna's coverage based on the proximity of the tower to other towers in the area. This is the area in which the cell phone could connect with the tower given the angle of the antenna and the strength of its signal. Finally, using his training and experience, Special Agent Raschke predicts where the coverage area of one tower will overlap with the coverage area of another. [¶] Applying this methodology, Special Agent Raschke testified that he could estimate the general location of Evans's cell phone during an 18 minute period (from 12:54 p.m. to 1:12 p.m.) on April 24, 2010, during which time Evans's phone used two cell towers to place nine calls. According to Special Agent Raschke, based on his estimate of the coverage area for each of the antennas, the calls made from Evans's phone could have come from the location where the victim was held for ransom." (*Id*. at p. 952.)

15

After concluding Special Agent Raschke qualified as an expert concerning the operation of cell phone networks, and such expert testimony would be helpful to the jury because it narrowed down the possible locations of Evans's cell phone during the relevant period of time (*Evans*, *supra*, 892 F.Supp.2d at pp. 954-955), the district court concluded the specific theory of granulization was not shown to be sufficiently reliable, explaining: "Estimating the coverage area of radio frequency waves requires more than just training and experience, however, it requires scientific calculations that take into account factors that can affect coverage. Special Agent Raschke presented no scientific calculations and did not consider a variety of relevant factors. Although the call data records upon which he relied are undisputed, the link between those records and his conclusions is deficient." (*Id*. at p. 956.) The court further explained that "granulization theory remains wholly untested by the scientific community, while other methods of historical cell site analysis can be and have been tested by scientists," and the theory "has not been generally accepted in the scientific community," both of which are factors weighing against a finding of reliability under *Daubert*. (*Id*. at pp. 956-957.)

Defendant's reliance on *Evans* is misplaced. As a preliminary matter, we note *Daubert, supra,* 509 U.S. 579 does not apply to the admission of evidence of new scientific methodologies in California state courts. *Kelly* does. (*Kelly, supra,* 17 Cal.3d 24.) *Daubert* governs the admission of such evidence in the federal courts. Under *Daubert*, general acceptance in the relevant scientific community is a factor to be considered, along with others, in determining whether or not expert testimony regarding a new scientific methodology is sufficiently reliable to be admitted into evidence (*Daubert*, *supra*, 509 U.S. at pp. 592-595), whereas, in California, general acceptance in the relevant scientific community is a prerequisite to the admission of such testimony. (*People v. Leahy*, *supra*, 8 Cal.4th at pp. 593-595, 598-604.) However, in *Evans, supra,* 892 F.Supp. 949, the federal district court found granulization theory had not gained such

16

general acceptance, which determination would, by itself, render expert testimony concerning the theory inadmissible under *Kelly*. We need not determine whether the district court in *Evans* got this right because our case does not involve granulization theory. Unlike Special Agent Raschke, Detective Bearor did not purport to have estimated the coverage area of specific cell towers based on their proximity to other towers. Nor did he claim to have determined the location of defendant's cell phone based on his ability to predict overlapping coverage areas. Those were the salient aspects of granulization theory found to be lacking in reliability. While Detective Bearor did perform the initial steps taken by the expert in *Evans*, i.e., he identified the locations of the cell sites used by defendant's phone before and after the robbery, the specific sector of those towers receiving the signal from defendant's phone, and the direction of that sector's coverage, nothing in the *Evans* decision casts doubt on the ability of an expert to testify to these matters or to the relatively common sense deduction that the phone must have been in the general area of the cell tower and in the general direction of coverage. Indeed, other federal district court decisions, involving expert testimony far more analogous to that given by the detective in this case, have found such testimony to be reliable under *Daubert, supra,* 509 U.S. 579. (See, e.g., *United States v. Machado-Erazo* (D.D.C. 2013) 950 F.Supp.2d 49, 57-58; *United States v. Jones* (D.D.C. 2013) 918 F.Supp.2d 1, 4-6.) As we have already explained, we conclude such testimony does not describe a "new scientific methodology" at all, and therefore, *Kelly* does not apply. (*People v. Leahy*, *supra*, 8 Cal.4th at p. 591.)

Finally, we also reject defendant's assertion sections 801 and 802 barred Detective Bearor's testimony. Section 801 provides expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and "[b]ased on matter (including his [or her] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him [or her] at or before the hearing, whether or not

17

admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates, unless an expert is precluded by law from using such matter as a basis for his [or her] opinion." Section 802 provides: "A witness testifying in the form of an opinion may state on direct examination the reasons for his [or her] opinion and the matter (including, in the case of an expert, his [or her] special knowledge, skill, experience, training, and education) upon which it is based, unless he [or she] is precluded by law from using such reasons or matter as a basis for his [or her] opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his [or her] opinion is based."

Defendant does not dispute the operation of cell phone systems and analysis of call detail records is sufficiently beyond common experience that expert testimony on the subject would assist the jury. Instead, he complains such records, "standing alone, were not the type of matter upon which an expert could reasonably rely in formulating an opinion about the location of a particular cell phone" with any degree of precision. But, as we have explained, Detective Bearor did not purport to know the location of defendant's cell phone with any degree of precision. He simply identified the phone's location as being in the general area of a particular cell tower and on a particular side of that tower. For reasons already expressed, call detail records may be reasonably relied upon to express such a limited opinion. Defendant then reiterates his argument that "granulization theory" is not reliable. But, as we have also explained, Detective Bearor did not testify to using such a theory in determining, very generally, where defendant's cell phone was located the night of the robbery. Thus, defendant's arguments under sections 801 and 802 also fail.

Because Detective Bearor's expert testimony regarding his analysis of the call detail records for defendant's cell phone the night of the robbery was not inadmissible

18

under the *Kelly* test or sections 801 and 802, defendant's trial counsel was not ineffective for failing to make a futile objection to the evidence on these grounds.

## II

### *Pitchess Motion*

Defendant requests that we review the trial court's determination, after conducting an in camera review of Detective Bearor's personnel files under *Pitchess*, that such files contained no discoverable material. We have done so and conclude there was no abuse of discretion.

A criminal defendant has the right to "compel discovery" of certain information in police officer personnel files by demonstrating good cause. (*Pitchess*, *supra*, 11 Cal.3d at pp. 536-538.) That right is codified in sections 1043 through 1045 and Penal Code sections 832.7 and 832.8. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 81 (*City of Santa Cruz*).)

A request for discovery of such records must be made by a written noticed motion (§ 1043, subd. (a)) supported by affidavits showing "good cause" for the discovery or disclosure of the documents sought. Good cause is shown by setting forth the "materiality" of the information sought to the subject matter of the pending litigation and stating "upon reasonable belief" the identified governmental agency has the records or information sought. (§ 1043, subd. (b)(3); *City of Santa Cruz*, *supra*, 49 Cal.3d at p. 82.) This two-part showing is a "relatively low threshold for discovery." (*City of Santa Cruz*, *supra*, at p. 83.)

Once the trial court finds good cause has been shown, it must conduct an in camera review of the records and disclose only those records and information that are relevant and not subject to exclusion from disclosure. (§ 1045, subds. (a) & (b).) To facilitate meaningful appellate review, the trial court must make a record of the documents it considered before ruling on the motion. (*People v. Mooc*, *supra*, 26 Cal.4th

at pp. 1228-1230 ["the court can prepare a list of the documents it considered, or simply state for the record what documents it examined"].)

Here, defendant filed a *Pitchess* motion seeking discovery of personnel files pertaining to two detectives, Bearor and Matt Sanchez. In support of the motion, defendant's trial counsel submitted a declaration stating the defense contended Detective Bearor "obtained a confession through unlawful means," and both detectives "intentionally misrepresented and falsified documents" and carried out "an improper search and seizure." The declaration further stated defense counsel believed the Elk Grove Police Department possessed complaints filed against each detective, alleging they "committed acts of dishonesty and/or providing false information or testifying falsely," and other files generated during the investigation of such complaints. The City opposed the motion, arguing defendant failed to show good cause because defense counsel's declaration offered no facts supporting the foregoing assertions of unlawful, untruthful, and improper conduct on the part of either detective.

At the hearing on the motion, defense counsel withdrew as a basis for the motion the assertion Detective Bearor unlawfully obtained a confession from defendant. Indeed, as the City pointed out in opposition, no confession was obtained from defendant. With respect to the other two bases for the motion, defense counsel argued (1) Detective Bearor submitted a warrant return to the magistrate who issued a particular search warrant misrepresenting what was seized during that search, and (2) both detectives committed misconduct in conducting a separate search that was ultimately found by the trial court to be unlawful. The trial court found good cause to conduct an in camera review of documents in Detective Bearor's personnel file based on the misrepresentation in the warrant return. After conducting an in camera hearing on whether there are any complaints or investigations of Detective Bearor falsifying documents, engaging in untruthful acts, or falsely reporting any investigation he had done for the Elk Grove

20

Police Department, the trial court determined "that there are no such complaints of untruthfulness or veracity or anything of that nature."

A trial court's ruling on the discoverability of material in police personnel files pursuant to *Pitchess, supra,* 11 Cal.3d 531 is reviewed for an abuse of discretion. (*People v. Hughes* (2002) 27 Cal.4th 287, 330.) We have reviewed the sealed transcript of the hearing held in camera and conclude the trial court did not abuse its discretion in determining the records contained no discoverable material.

DISPOSITION

The judgment is affirmed.


/s/

HOCH, J.

We concur:


/s/

HULL, Acting P. J.


/s/

BUTZ, J.

21