Filed 12/22/22  P. v. Upshaw CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TIKISHA UPSHAW,<br><br>        Defendant and Appellant. | A160803<br><br>(Alameda County<br>Super. Ct. No. 468261C) |

Tikisha Upshaw (appellant) appeals from her conviction, following a jury trial, for first degree murder with a true finding that the murder was committed for financial gain (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(1)).[1]  Appellant raises a number of evidentiary and instructional challenges, as well as a challenge to certain fines and assessments.  We affirm.

---

[1] All undesignated section references are to the Penal Code.

1

BACKGROUND

A.    *Prosecution Case*

1.    *Appellant and Katami's Joint Venture*

Appellant and victim Adan Katami began a joint venture in the fall of 2015 seeking to obtain city approval for a cannabis dispensary. Katami's uncle, Luis C., was a lobbyist for real estate developers and frequently advised appellant and Katami between January and April 2016. Luis's understanding was that Katami provided the initial financial investment and appellant handled day-to-day expenses.

In February or March of 2016, appellant began expressing concerns to Luis that Katami was becoming increasingly unreliable and unprofessional because of alcohol and drug use. In May or June, appellant told Luis that Katami wanted to be bought out of the partnership for $1 million, a price appellant thought was unreasonable.

2.    *Katami's Murder*

On the afternoon of July 13, 2016, Katami was shot multiple times and killed while driving his truck. Police arrested Johnny Wright, who was found nearby soon after the shooting and matched the description of the shooter. Wright subsequently wrote letters from jail in which he admitted killing Katami but provided varying accounts of the event (see *post,* part II).[2]

Police also arrested Chariott Burks, who testified at appellant's trial as part of a plea agreement. Burks had met Wright in Memphis in March of 2016 and, in early July, they drove to California, arriving around July 8 or 9. Wright had purchased a cellphone for Burks and sometimes used it to make calls and send text messages; Burks also received calls and messages for

_____

[2] The trial court granted Wright's motion to sever his trial from appellant's following opening arguments.

2

Wright on that phone. On July 12, Wright left Burks alone for several hours, returning with a bag containing marijuana and a large stack of bills. On July 13, Burks and Wright set out, Burks driving according to Wright's directions. Eventually, Wright got out of the vehicle with a gun in his hands. Burks heard shots and drove away.

3. *Cell Phone Evidence*

Wright's cell phone had an outgoing text message sent on July 10, 2016, to an AT&T "GoPhone"—a prepaid cell phone requiring no identification or registration—with a 530 area code (hereafter, the "530 GoPhone"), stating, "Watching for now. As soon as deposit is completed, lights out." About an hour and a half later, Wright's phone texted the 530 GoPhone, "I'm not trying to meet up with you for a deposit after because I'll be in a whole different state when I contact you for my balance. You want it done I'm here. Your move." Five minutes after receiving this text, the 530 GoPhone sent a text to Wright: "Gt it tryn to get it 2 u." Law enforcement believed these messages were referring to a murder for hire, and therefore considered identifying the person who possessed the 530 GoPhone at that time central to the investigation.[3]

The 530 GoPhone had been activated on June 28, 2016 and was last used on July 13, 2016, the day Katami was killed. Investigators reviewed the call and text records of multiple phones for this time period, including the 530 GoPhone, appellant's phone, Wright's phone, Burks's phone, and the

---

[3] The 530 GoPhone was never located. When police searched appellant's home and car in December 2016, they did not find the 530 GoPhone but found packaging and a refill card for other AT&T GoPhones.

3

phone of Wessley Brown, a long-time close friend of appellant.[4]  During that time frame, appellant's phone, Wright's phone, and the 530 GoPhone all exchanged calls with a phone number for someone referred to as "Mike Jones," sometimes within an hour or minutes of each other.  Wright's phone exchanged numerous calls with a phone number listed as a contact in appellant's phone.  The 530 GoPhone also exchanged calls and texts with Burks's phone.[5]  No calls or texts were exchanged between the 530 GoPhone and appellant's phone.

In addition to call and text records, law enforcement obtained two types of cell phone location data for the relevant phones, as testified to by an expert in interpreting and mapping cell phone location data.  The first type of data was cell tower data: each time a cell phone sends or receives a call or text, it connects to a physical cell tower.  A record is created of both the specific cell tower and the "azimuth," which indicates—by dividing the area surrounding the tower into three triangular sections—on which side of the tower the cell phone was located when it connected to the tower.  Cell phones connect to the tower with the strongest signal, which, depending on factors including elevation and physical impediments, may not be the tower geographically closest to the phone.  In the Bay Area, cell towers have an effective range of between one and three miles.

The second type of location data was obtained from AT&T's proprietary software called Network Event Location Service, or NELOS.  NELOS uses an algorithm to identify the approximate longitude and latitude of the phone,

---

[4] Brown was initially charged along with appellant, Wright, and Burks, but his case was otherwise resolved.

[5] Burks testified she received a phone call for Wright from a female with a 530 area code.

4

with varying degrees of accuracy up to 25 meters. NELOS data is generated at varying intervals and is not limited to times when the phone made or received calls or texts. This data was only available for phones using AT&T services, as relevant here, the 530 GoPhone, one of Wright's phones, and one of Burks's phones.

The expert analyzed and compared location data for the 530 GoPhone, appellant's phone, and other relevant phones using cell tower and, when applicable, NELOS data. NELOS data showed the 530 GoPhone was within 25 meters of appellant's home in San Leandro on five occasions between July 1 and July 8, 2016.[6] Cell tower data showed the 530 GoPhone connected to towers near appellant's home on numerous occasions between June 28 and July 10. Both NELOS and cell tower data showed the 530 GoPhone and appellant's personal phone were often close to one another between June 28, 2016, and the evening of July 10, 2016: either appellant's phone and the 530 GoPhone connected to the same tower or to nearby towers, or appellant's phone connected to a tower near to where NELOS data placed the 530 GoPhone. During this time, cell tower data showed Brown's phone generally stayed near his residence in Berkeley and further showed seven instances when Brown's phone and the 530 GoPhone were too far apart geographically at the same time to have been possessed by the same person.

On the morning of July 10, cell tower data showed the 530 GoPhone connected to a cell tower near appellant's home when it called Wright's phone. Cell tower data further showed, later that morning, when Wright's phone and the 530 GoPhone exchanged the messages about a "deposit" and

---

[6] A long-term, close friend of appellant's testified appellant lived alone and she had never seen anyone else living at appellant's house or heard anyone but appellant answer appellant's phone.

"lights out," the 530 GoPhone repeatedly connected to cell towers near appellant's home. Around 11:00 a.m., cell tower data showed the 530 GoPhone was near appellant's house and Wright's phone was near Oakley. Around 2:00 p.m., the 530 GoPhone called Wright's phone; both phones connected to cell towers in the same location. Cell tower data and NELOS data showed appellant's phone and the 530 GoPhone subsequently both went to the same approximate locations in San Francisco. A calendar entry and Facebook post by appellant showed appellant at or near where the cell tower and NELOS data placed her phone and the 530 GoPhone.

About 10:20 p.m. on July 10, 2016, appellant's phone called Brown's phone; both phones connected to a tower near Brown's house. Shortly after 11:00 p.m., the 530 GoPhone was near Brown's house in Berkeley; five minutes later, appellant's phone connected to a cell tower in East Oakland. Between then and July 13, NELOS and cell tower location data always placed the 530 GoPhone near Brown's house. Around midnight on the evening of July 11, Brown texted appellant, "No calls. Good night. Get some rest." On the morning of July 13, 2016, the day Katami was murdered in the afternoon, appellant's phone called Brown's phone at 9:32 a.m., the 530 GoPhone called Wright's phone at 9:35 a.m., Wright's phone called the 530 GoPhone at 9:38 a.m., and Brown called appellant at 9:39 a.m. From this exchange, law enforcement believed Brown was relaying information between appellant and Wright.

4. *Additional Evidence*

Five days after Katami's murder, the following search was conducted on appellant's Google account: "Are lawyers required to report crimes?"

6

After appellant and Brown were arrested in December 2016, they were placed in adjoining holding cells and secretly recorded.[7] Appellant told Brown, "They said I guess he must be talking," and told Brown she would get a lawyer "for us," assuring him she would "make sure that you're taken care of." Brown told appellant, "they got me on murder," explaining, "they know about that phone call and they said, 'Why'd you call them? I said, 'She asked me to call them. I don't know why.'" Appellant told Brown, "You shouldn't have said that," instructing him to "[s]ay you lied about me tellin' you to call him or whoever they talkin' 'bout."

B.     *Defense Case*

1.     *Cell Phone Evidence*

A private investigator testified as an expert in the analysis of cellphone location data mapping. The expert analyzed data for the 530 GoPhone, appellant's phone, and Brown's phone, finding numerous records where the 530 GoPhone was not in use at the same time as appellant's or Brown's phone, meaning there was no way to know whether any of those phones were possessed by the same person at those times. He opined that it was therefore possible for either the person who possessed Brown's phone or the person who possessed appellant's phone to have possessed the 530 GoPhone between June 28, 2016 and July 13, 2016.

2.     *Appellant's Testimony*

Appellant testified on her own behalf. She denied any involvement in the murder and any knowledge of Wright or the 530 GoPhone.

In 2016, Katami was assisting appellant with her marijuana growing and distributing business. She was distributing legally in the Bay Area and

---

[7] A portion of the recording was played for the jury and a complete transcript was provided.

illegally in Tennessee, where she had connections. Appellant and Katami agreed to try to open a dispensary in San Francisco. Katami put approximately $8,500 into the business. After Katami began using cocaine and methamphetamine, their relationship deteriorated, but Katami never asked appellant for $1 million. Appellant did not tell Luis that Katami had asked her for $1 million; instead, when Luis suggested appellant buy Katami out of the business, she jokingly said, "he probably wants $1 million."

Appellant testified she had known Brown since she was young and they had dated for about a year in the early 2000s. They began dating again in May or June of 2016 and were always together. She let Brown use her phone, as well as other people who were helping her with her business. When appellant told Brown that Katami, not Brown, would be her partner in the marijuana dispensary venture, Brown was visibly upset.

Appellant addressed statements she made in the holding cell recording following her and Brown's arrest, explaining she was upset when Brown said he told police appellant told him to "call them" because she thought he had incriminated himself, and she directed him to say that was a lie because, in so saying, he would be telling the truth. She reassured Brown that she would get him a lawyer because she loved him and thought he was incriminating himself. Subsequently, Brown confessed to appellant that he had murdered Katami.

C. *Verdict and Sentence*

The jury found appellant guilty of first degree murder and found true the allegation that the murder was committed for financial gain.[8] The trial

---

[8] Appellant pled guilty to additional drug charges.

8

court denied appellant's motion for a new trial and imposed a sentence of life without the possibility of parole.

## DISCUSSION

I. *Admission of NELOS Data*

Before trial, appellant sought to exclude expert testimony about the NELOS data as unreliable under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747.  Following an Evidence Code section 402 hearing, the trial court ruled the evidence was admissible.  Appellant argues this ruling was prejudicial error.

We need not decide whether admission of the NELOS data was in error because we find any error harmless.  The erroneous admission of expert testimony is harmless if "it is not reasonably probable the verdict would have been more favorable absent the challenged portion of" the expert's testimony. (*People v. Jones* (2013) 57 Cal.4th 899, 939–940.)[9]  Because, as explained below, the cell tower data established the same relevant facts as the NELOS data, we find no such reasonable probability.

As an initial matter, appellant does not challenge the admissibility of the testimony about cell tower location data.  (See *People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1187 ["expert testimony explaining a cell phone signal received by a certain side of a cell tower must have come from that side of the tower and in the general vicinity of the tower does not describe a new

---

[9] We reject appellant's contention that any error violated her constitutional rights to due process and a fair trial.  "[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*Jones, supra,* 57 Cal.4th at p. 957.)  Appellant has failed to demonstrate this case presents an exception to this general rule.

9

scientific technique subject to the standard set forth by our Supreme Court in [*Kelly*] for admitting the results of such techniques"].)  Although appellant attempts to undermine the significance of the cell tower evidence by pointing to testimony that cell towers have a range of 25 square miles, she ignores testimony that in the Bay Area, where all of the relevant cell tower data was generated, cell towers have an effective range of between one and three miles. We acknowledge that the cell tower location data is less precise than the NELOS data purported to be, and that in some respects there was more NELOS data than cell tower data.  Nonetheless, as explained below, the cell tower data established the same critical facts as the NELOS data.

Cell tower data, like NELOS data, linked the 530 GoPhone to appellant's home.  Cell tower data demonstrated that the two cell towers most frequently connected to by the 530 GoPhone between June 28 and July 13, 2016 were located near appellant's house, totaling hundreds of connections to these towers.  Cell tower data also demonstrated that at least 10 of the times the 530 GoPhone exchanged calls or text messages with Wright—including the "deposit"/"lights out" text exchange—the 530 GoPhone connected to a cell tower near appellant's house.

Similarly, while NELOS data was used to link the 530 GoPhone to appellant's cell phone, cell tower data also established this link.  The People introduced evidence of multiple occasions when the 530 GoPhone and appellant's cell phone connected to the same or nearby cell towers within minutes of each other between June 28 and July 10, 2016, including on the morning of July 10, shortly before the 530 GoPhone and Wright's phone connected to towers near each other.  During the same time period, the 530 GoPhone and Brown's cell phone connected within minutes of each other

10

to cell towers that were so far apart the same person could not have possessed both phones.

Finally, a substantial amount of NELOS data linked the 530 GoPhone to Brown's home between the evening of July 10 and July 13, 2016, and there was only evidence of two connections to a cell tower near Brown's home during that time. However, placement of the 530 GoPhone at Brown's home between July 10 and the morning of July 13 was not a critical part of the prosecution's case. More significant was the call data suggesting that Brown was relaying messages between appellant and Wright on the morning of July 13, which did not depend on NELOS data.

Thus, cell tower data demonstrated the same critical facts shown by the NELOS data: the 530 GoPhone was used the overwhelming majority of the time near appellant's house; between June 28 and the evening of July 10, the 530 GoPhone was used within minutes of appellant's cell phone connecting to the same or nearby cell towers; during the same time, the 530 GoPhone was used within minutes of Brown's cell phone using cell towers located far from each other; and on the morning of July 13, 2016, the 530 GoPhone was used near Brown's house.[10]

Appellant argues the prosecutor's closing arguments highlighted the significance of NELOS data, but the prosecutor discussed both NELOS and cell tower data. For example, the prosecutor highlighted cell tower evidence from July 10, 2016: "The texts to Wright are from this GoPhone. This GoPhone that's activated by a tower by her house. And the texts directly talk

---

[10] NELOS data was also used to track the cross-country trip taken by Wright and Burks in early July 2016 and Burks's movements on July 13, 2016, but these movements were not contested by appellant or material to linking her to the 530 GoPhone.

about exchange of money and lights out. And what's the response? 'I got it, trying to get it to you.' All of the texts that are received on that phone are from towers that cover [appellant's] house. [¶] Now, that GoPhone calls Mr. Wright at 11:00 o'clock that morning. Again, from a tower which covers [appellant's] house. The GoPhone calls Johnny Wright again at 11:21 a.m. Again, from a tower by [appellant's] house." Indeed, after defense counsel spent a substantial amount of time during closing arguing that NELOS data was unreliable, in rebuttal the prosecutor disputed the challenge but also argued, "It is not the NELOS that I'm asking you to convict the defendant based on. And, frankly, I don't even agree that if you took that away, that would really damn the case. You still have the same cell tower evidence."

Although appellant also argues prejudice is shown in the expert's opinion regarding whether the same person possessed the 530 GoPhone and appellant's cell phone between June 28 and July 10, 2016, appellant concedes this opinion "rested substantially upon cell tower connections." Appellant therefore concedes that any erroneously admitted NELOS data did not impact this opinion.[11]

---

[11] Appellant separately argues this opinion was not supported by the evidence. The expert testified the 530 GoPhone and appellant's phone "didn't have meaningful separation from one another" between June 28 and July 10 because "I didn't find cell tower hits that would indicate that when the 530 [GoPhone] was making a phone call, it was in a place that was incompatible with when [appellant's phone] was making a phone call." When asked if there was a possibility that two different people possessed the phones during this time, the expert testified, "I don't see any information in the records that would indicate that. There's—there are gaps in some of the records, just because that's how call detail records are. They don't always nicely overlap, but I didn't see any meaningful -- there's nothing about the records that would make me doubt what I answered you before." On cross-examination, the expert clarified, "It's my opinion that the person who had the 510 number [appellant's phone] could not be eliminated from having the 530 number from

Accordingly, we find any error in the admission of the NELOS data did not prejudice appellant. For the same reason, we reject appellant's contention that admission of the NELOS data compelled her to testify in her defense.

II.     *Admission of Wright's Jail Letters*

Appellant challenges the admission of letters written by Wright while he was in jail. We reject the challenge.

A.     *Additional Background*

The trial court admitted, over appellant's objection, 11 letters written by Wright while he was in custody. In the letters, Wright admits shooting Katami but provides varying accounts of what happened. Some of the letters encourage Burks to say Wright committed the killing in a road rage incident after another driver almost hit them.

Another letter, addressed to "Cuz," refers to a "fly ass chick" Wright met in California and exchanged phone numbers with. When a man called Wright from this woman's phone and was unable to explain why he was calling, Wright felt "disrespected and insulted." Already stressed about personal and work issues, Wright "went for a ride" to calm down but someone

---

June 28th until July 10th." This opinion was fairly supported by the cell tower evidence in the record. Cases cited by appellant are distinguishable. (*People v. Azcona* (2020) 58 Cal.App.5th 504, 513–514 [court erred in allowing expert opinion that "the matching marks on the relevant projectiles are 'much more than can ever happen by random chance,' and therefore the projectiles came from the same gun, 'to the practical exclusion of all other guns' " with the only support being "a broad reference to having 'done numerous studies on the subject trying to see what can happen by random chance' "]; *U.S. v. Evans* (N.D. Ill. 2012) 892 F.Supp.2d 949, 956 [expert opinion "[e]stimating the coverage area of radio frequency waves" excluded when based solely upon "training and experience" rather than "scientific calculations that take into account factors that can affect coverage"].)

13

"almost ran me off the road." Wright "lost it" and shot him. He concluded the story by saying, "Cuz word need to get to that chick that if I just so happen to need a paid lawyer a donation would be greatly appreciated."

In another letter addressed to "Cuz," Wright wrote, "I told our family member to stop calling me over and over again but she didn't listen! She even kept calling after I got arrested now they have pulled the phone records of my phone and the victim['s] phone and my lawyer has aske[d] me about that number of hers my lawyer has also informed me that the D.A. thinks that someone out here paid me and that's not true. It's just a matter of time they may try to find her so what I'm going to do is tell my lawyer that she is a family member that I saw w[h]ile I was out here on vacation she told me that this guy was harassing her and then one day he robbed and physically assaulted her and when she told me that I got very upset but she didn't know that I was going to react like I did that's all she know! Cuz get on this for me!"

Finally, in one of the letters Wright recounts counting "stacks on stacks" of money during his trip to California.

B.    *Analysis*

Appellant argues the letters were hearsay and the trial court erred in admitting them as declarations against interest (Evid. Code, § 1230). We disagree with the threshold characterization of the letters as hearsay because they were not admitted for the truth. (*Id.*, §1200, subd. (a) [hearsay is statement "offered to prove the truth of the matter stated"].) As appellant acknowledges, the People argued Wright overwhelmingly lied about the circumstances surrounding the killing in the letters in order to minimize his

14

culpability.[12] While the prosecution suggested the "fly ass chick" and female "family member" were both references to appellant, the prosecution did not seek to introduce the letters for the truth of the stories Wright recounted about these women. Because the letters were not offered for the truth of their statements, they are not inadmissible hearsay. (See *People v. Mendoza* (1987) 192 Cal.App.3d 667, 672 ["[T]he prosecution was not offering this evidence [the appellant's statements that he had been washing his truck at the time of the crime] to prove that appellant had been washing the truck immediately prior to being stopped by the police. Appellant's statements were valuable to the prosecution only if proven false. Under these circumstances, the evidence was not hearsay. . . ."].) For the same reason, introduction of the statements did not violate appellant's confrontation clause rights, even assuming the letters were testimonial. (*People v. Thomas* (2012) 53 Cal.4th 771, 803 ["the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted' "].)

Appellant does not challenge the relevance of the letters on appeal, and we do not decide that issue.[13] Even if admission of the letters had been error,

---

[12] To the extent the prosecutor sought to admit the letters as evidence that Wright killed Katami, any error is harmless as other evidence (largely omitted from the background facts above) overwhelmingly so established. Indeed, during opening statements before Wright's trial was severed from appellant's, Wright's counsel admitted that Wright killed Katami.

[13] We note the prosecution's theory of relevance, as argued to the trial court: "the fact that [Wright] constantly changes hi[s] story about why he [killed Katami], lends credibility to the argument in this case and to the evidence that there was somebody else involved who he's trying to actively hide and shield from this case, which fits right into the People's case and is right what the defense is challenging in this case."

the error would be harmless. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 813, 825 [erroneous admission of evidence reviewed for harmlessness under state law standard].)[14]  Appellant claims Wright's letters were "critical" in linking appellant to Wright, but any inference that the two women referred to in Wright's letters were appellant was weak at best: the references contained no names, identifying information, or other possible way to connect them to appellant.  Similarly, Wright's reference to counting "stacks" of money included no connection to appellant or to receiving the money in exchange for committing murder.

The prosecutor's closing argument does not demonstrate prejudice.  The prosecutor read a few brief excerpts from the letters, telling the jury, "he's been paid to do this [kill Katami].  He hasn't been paid to get caught and give the person up who has paid him.  So he's going to make up stories about why he did what he did, but his story changes over time in these letters."  After excerpts about the "fly ass chick" and counting "stacks," the prosecutor

---

[14] We reject appellant's assertion that admission of the letters violated her right to due process and a fair trial because they were unreliable.  (See *People v. Gutierrez, supra,* 45 Cal.4th at p. 813 ["Defendant alleges that the trial court's erroneous admission of [certain evidence] also violated his Fourteenth Amendment right to due process, but fails to provide authority for this proposition, other than his bare assertion that the statement lacked particularized guarantees of trustworthiness.  Defendant also fails to explain how a statement's lack of trustworthiness violates the Fourteenth Amendment's due process guarantee.  Defendant is unable to establish a federal constitutional violation; accordingly, we analyze the trial court's error under the test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243 to 'evaluate whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error ." ' "].)  We address appellant's claim of instructional error with respect to this evidence separately (*post,* part III) and reject appellant's contention that any "combination of errors" requires harmlessness be reviewed under the federal constitutional standard.

argued that Wright has "got to be just as worried about the person who hired him getting caught as the person who hired him was worried about him. [¶] Who's going to talk first? Who's going to feel the pressure?" After the excerpt about the female family member, the prosecutor argues, "He's getting close to what's going on in this case. Not perfectly, but he's getting close." Thus, the prosecutor used the letters to bolster its theory that Wright was paid to commit the murder—a theory appellant did not dispute—but made no claim that appellant specifically was implicated by the letters. Accordingly, it is not reasonably probable that the result would have been different if Wright's letters had not been admitted.

III.    *Accomplice Instruction*

Appellant argues the trial court erred in failing to provide accomplice instructions with respect to Wright's letters—an instruction the court did provide as to Burks's testimony—and in failing to instruct the jury that Wright's letters and Burks's testimony could not corroborate each other.[15] (See § 1111 ["A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. . . ."]; *People v. Rangel* (2016) 62 Cal.4th 1192, 1222 ["the testimony of one accomplice cannot corroborate that of another accomplice"].)

We need not decide whether the trial court erred in failing to provide these instructions because any error was harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' [Citation.] To corroborate the testimony of an accomplice, the prosecution must present 'independent

_____

[15] Appellant argues the latter asserted instructional error was prejudicial as to the murder for financial gain special circumstance.

17

evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] ' "[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." ' " (*People v. Avila* (2006) 38 Cal.4th 491, 562–563.)

There was ample evidence implicating appellant in both the murder and the murder for financial gain special circumstance other than Wright's letters and Burks's testimony. The call and text records and the cell tower location data linked appellant to Wright and to the text message exchange about "lights out" once the "deposit is completed." The text message exchange provided evidence that Wright was paid to commit the murder. Evidence that appellant had a difficult partnership with Katami and may have wanted to avoid buying him out of the business provided a motive. Accordingly, any error in failing to instruct on accomplice testimony was harmless.

IV. *Unanimity Instruction*

Appellant argues the trial court erred in refusing to instruct the jury that it must unanimously agree on a theory to support the murder for financial gain special circumstance. The alternate theories provided to the jury were (1) the killing was carried out for appellant's financial gain, and (2) appellant hired another person to perform the killing and the killing was carried out for that person's financial gain.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it

18

relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.] There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when the statute contemplates a continuous course of conduct or a series of acts over a period of time.' [Citation.] There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) The Supreme Court has "assume[d], without deciding, that the unanimity requirement applies to special circumstance findings" (*id.* at p. 680), and we will do the same.

Appellant argues the same defense exception does not apply because defense counsel argued killing Katami was not in appellant's financial interest and challenged the credibility of witnesses providing evidence that Wright received money for the killing. While the nuances of these defenses may have differed, the ultimate defense was the same: appellant had no connection to Wright and no involvement in the killing. *People v. Riel* (2000) 22 Cal.4th 1153 is instructive. In that case, there was evidence the defendant robbed a store and subsequently robbed a store employee, and the defendant argued a unanimity instruction was required. (*Id.* at pp. 1173, 1199.) The Supreme Court rejected the contention, reasoning, "The defense was the same as to both: defendant was asleep in the backseat of the car and did not participate in any act of robbery. By contrast, in *People v. Diedrich, supra,* 31 Cal.3d 263, which found prejudicial error in not requiring unanimity, the facts showed two distinct acts of bribery to which the

19

defendant offered different defenses: a 'simple denial' of one act and an
' "expla[nation]" ' of the other. [Citation.] Accordingly, the *Diedrich* jury
could have divided on which bribery he committed, with the result that there
was no unanimous verdict as to any act. There was no such possibility here."
(*Riel,* at p. 1199; see also *Jennings, supra,* 50 Cal.4th at p. 680 [same defense
exception applied to torture-murder special circumstance for torture
continuing over multiple months where "defendant consistently argued that
he lacked the specific intent to kill [the victim] and that the drugs were the
primary cause of death"].) As in *Riel,* appellant's defense to each theory was
the same and there was therefore no possibility that the jury could have
divided on the murder for financial gain special circumstance.[16]

## V. *Fines and Assessments*

The court imposed a $300 restitution fine (§ 1202.4, subd. (b)), a $30
criminal conviction assessment (Gov. Code, § 70373), and a $40 court
operations assessment (§ 1465.8), despite finding appellant lacked the ability
to pay. Appellant argues imposition of the fine and assessments without
establishing her ability to pay violated her constitutional rights to due
process and to be free from excessive fines, citing *People v. Dueñas* (2019)
30 Cal.App.5th 1157 (*Dueñas*).[17]

In *Dueñas, supra,* 30 Cal.App.5th 1157, the defendant was indigent and
had suffered misdemeanor convictions for driving with a suspended license;
her license had been suspended because she was unable to pay three juvenile

---

[16] Appellant argues she was prejudiced by cumulative error. We have
assumed certain errors but found them harmless. Considered together, the
assumed errors are still harmless. (See *People v. Cain* (1995) 10 Cal.4th 1, 82
["Defendant was entitled to a fair trial, not a perfect one."].)

[17] The issue is currently before the Supreme Court. (*People v. Kopp*
(2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

citations. (*Id*. at pp. 1160–1161.) The Court of Appeal held section 1202.4 requires a trial court to impose a minimum restitution fine regardless of ability to pay, but the constitutional right of due process requires that execution of the fine be stayed until the defendant's ability to pay is determined. (*Dueñas*, at p. 1172.) The court further found it was a violation of due process to impose the assessments without finding that the defendant had the ability to pay them. (*Id*. at p. 1168.)

We agree with those courts that have concluded that *Dueñas*, although possibly correct on its facts, was incorrect to the extent it stated a broader rule that, as a matter of constitutional due process, ability to pay must be established before imposition of fines. (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055; *People v. Caceres* (2019) 39 Cal.App.5th 917.) As these cases explain, in contrast to the two strands of authority on which *Dueñas* relied, the failure to establish ability to pay a minimum restitution fine and assessments does not, absent unusual circumstances, impair defendants' access to the courts or subject them to imprisonment as a consequence. Appellant has not established that imposition of the fine and assessments violated her right to due process.[18]

DISPOSITION

The judgment is affirmed.

---

[18] We therefore need not decide whether appellant forfeited the issue, as the People contend.

_____
                                                    SIMONS, J.


We concur.



_____
JACKSON, P. J.




_____
WISEMAN, J.*




(A160803)



_____
        * Retired Associate Justice of the Court of Appeal, Fifth Appellate
District, assigned by the Chief Justice pursuant to article VI, section 6 of the
California Constitution.