Filed 8/17/20  P. v. Corona CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FRANCISCO CORONA,<br><br>    Defendant and Appellant. | B297528<br><br>(Los Angeles County<br>Super. Ct. No. VA143941) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael A. Cowell, Judge.  Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, and David W. Williams, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Francisco Corona of second degree murder (Pen. Code, § 187, subd. (a))[1] for killing Joseph Barela. The jury also found true the allegation Corona personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Corona argues that the trial court should have instructed the jury on voluntary manslaughter because there was substantial evidence he killed Barela in the heat of passion and that his trial counsel was ineffective in failing to ask the court to sanitize, or give an instruction limiting the use of, certain gang evidence. Finally, Corona argues the court erred in ordering him to pay 10 percent interest on his deposit in the Restitution Fund, which is administered by the Victim Compensation Board, because the Board is not a "victim" within the meaning of section 1202.4, subdivision (k).

We conclude the trial court did not err in failing to instruct on voluntary manslaughter because substantial evidence did not support such an instruction. We also conclude Corona did not receive ineffective assistance of counsel because his trial attorney had a rational tactical reason for not asking the court to sanitize the gang evidence or give a limiting instruction and because Corona cannot show prejudice. Finally, we conclude section 1202.4 required the trial court to order Corona to pay interest on the entire amount of the restitution award, including his deposit to the Board. Therefore, we affirm.

---

[1] Undesignated statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Corona "Taxes" Barela's Girlfriend*

Corona was a member of the Bell Gardens Locos criminal street gang. His gang moniker was "Flaco," and he had a Bell Gardens Locos tattoo on his face. Barela was a former member of the North Hollywood Boys criminal street gang. He was "involved in drugs," had "money problems," and had many enemies. According to one of his friends, Barela was often running from people and "lived his life watching his back." Barela's girlfriend, Laura Rice, used to live with Corona.

In May or June 2016 Rice was selling drugs in territory claimed by Bell Gardens Locos. Corona came to "tax" Rice, which a Bell Gardens police detective explained occurs when "someone is conducting business in the area that [gangs] claim as their territory." Corona collected the tax by taking Rice's cell phone and some drugs worth $10 or $20. Rice told Barela what happened.

B. *Barela Confronts Corona*

Soon after Barela learned Corona had taken Rice's cellphone and drugs, he confronted Corona. Barela's brother-in-law Maxwell Huerta, who had known Corona for several years and had also been taxed by him, witnessed the argument. According to Huerta, Barela and Corona argued and called each other names, and Corona pulled out a knife. Huerta saw that Barela also had a sharp object in his hand, which may have been a knife, and that both men "were up to stabbing each other." Huerta said that, until he intervened, Barela "did not want to get away" from Corona and "didn't want to stop messing with him."

3

Barela and Corona eventually calmed down, and Huerta later told police he believed the two men at that point were "cool" with each other.  Rice, however, testified "it was all bad" after that incident.

Corona later told Rice he "didn't want to pop his cherry on Joey," which she understood meant Corona did not want Barela to be his first "kill."  In late June or early July, several days before the shooting, Corona and Barela saw each other again.  Although Rice was not there, she said the encounter left Barela upset.

C.     *Corona Kills Barela*

On July 4, 2016, approximately one month after Huerta witnessed the argument between Barela and Corona, Barela visited Huerta in a tent by a riverbed near Bell Gardens where Huerta lived.  The tent was at the bottom of steps that led up to the top of the riverbed.

Huerta gave two versions of the incident that day involving Corona and Barela.  In a videotaped police interview in September 2016, a few months after Barela was killed, Huerta said that at approximately 5:00 p.m. or 6:00 p.m. he heard the sounds of an argument coming from the top of the riverbed.  Huerta went up the steps to investigate and saw Corona and Barela about 120 feet away from him.  Huerta initially thought "everything was cool," but then he heard Barela call Corona "a bitch" and yell, "You gonna take me out, fuckin' take me out."  Huerta saw Corona had a gun.  Huerta continued to walk forward until he was 15 feet away from the two men.  Huerta said Corona looked at him, looked at Barela, and shot Barela in the side.  Barela fell to the ground and began screaming, as

4

Corona was holding the gun and "looking at [Huerta] in [his] eyes." Before getting on Barela's bicycle and fleeing, Corona said to Huerta, "You better not say nothing."

In another interview and at trial, however, Huerta said that, while he was in his tent, he heard what he thought were fireworks, turned around, saw Barela, and ran up the steps. When he got to the top, he saw that what he believed were fireworks was actually a gunshot and that Barela was down on the ground screaming. Huerta said he saw a person with a gun in his hand whom he described as tall, skinny, and wearing "something black," like a mask. The shooter, whom Huerta said he could not identify, ran to a car and drove away.

An autopsy concluded Barela had been shot from an indeterminate range. The cause of death was a single gunshot wound from a bullet that entered the left side of Barela's body and exited his back, injuring several organs and his aorta.

The police did not find any forensic evidence, such as fingerprints or DNA, connecting Corona to the shooting. Corona denied he killed Barela, claiming his friend "Smash" did it. Corona acknowledged his prior confrontations with Barela, but claimed he had been in Huntington Park with two friends, Maria Gonzalez and Jose Lopez, at the time of the shooting. Investigators were unable to find either individual.

D.   *The Jury Convicts Corona of Murder*
The jury found Corona guilty of second degree murder and found true the firearm allegation. The trial court sentenced Corona on the murder conviction to a prison term of 15 years to life, plus 25 years to life for the firearm enhancement. The trial court ordered Corona to pay a relative of Barela restitution in the

5

amount of $1,359.85, plus 10 percent interest from the date of sentencing, and to deposit $7,500, plus 10% interest from the date of sentencing, in the Restitution Fund to reimburse the Board for assistance to Barela's family.  Corona timely appealed.

## DISCUSSION

A.    *The Trial Court Did Not Err in Failing To Instruct on the Heat of Passion Form of Voluntary Manslaughter*

1.    *Applicable Law and Standard of Review*

""""[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been committed*."'" [Citations.]  'Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.)  "A trial court must instruct a jury on lesser included offenses when the evidence raises questions regarding whether every element of a charged offense is present.  [Citation.] No instruction on lesser included offenses is required if there is no evidence that there was any offense less than that charged. Instructing the jury on a lesser included offense is not required when the evidence supporting such an instruction is weak, but """whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury,'"" such an instruction is required.  [Citation.]  Whether the evidence is substantial is tested by considering whether a jury would conclude the lesser but not the greater offense was committed." (*People v. Vargas* (2020) 9 Cal.5th 793, 827.)  "[W]e

6

review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

"'Murder is the unlawful killing of a human being . . . with malice aforethought.'" (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) "Voluntary manslaughter, a lesser included offense of murder, is defined as the unlawful killing of a human being without malice. [Citations.] Manslaughter instructions are warranted when substantial evidence exists to support a jury's determination that the killing was committed in the heat of passion and thus does not constitute a first degree murder." (*People v. Vargas, supra,* 9 Cal.5th at p. 827; see *People v. Smith* (2018) 4 Cal.5th 1134, 1163.)

"'Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' [Citation.] Heat of passion killing is distinct from malice murder because thought in some form is necessary 'to form either an intent to kill or a conscious disregard for human life.' [Citation.] A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought. If reason ""was obscured or disturbed by passion"" to so great a degree that an ordinary person would ""act rashly and without deliberation and reflection,"" . . . that killing arose from ""passion rather than from judgment.""" (*People v. Vargas, supra,* 9 Cal.5th at pp. 827-828; see *People v. Soto* (2018) 4 Cal.5th 968, 974; *People v. Avila* (2009) 46 Cal.4th 680, 705.) "Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of

7

thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

"'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively . . . . "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . ."'" (*People v. Rountree* (2013) 56 Cal.4th 823, 855.) "'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' [Citation.] '[P]rovocation is sufficient not because it affects the quality of one's thought processes but because it eclipses reflection.'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 650.)

> 2. *Substantial Evidence Did Not Support an Instruction on the Heat of Passion Form of Voluntary Manslaughter*

Corona argues the evidence of his prior arguments with Barela supported instructing the jury on the heat of passion form of voluntary manslaughter. He contends that the jury could have found that his passions were aroused when Barela called him a "bitch" and told him "You gonna take me out, fuckin' take me out"

8

and that Barela provoked him to act rashly and without reflection in their subsequent encounter. But because there was no substantial evidence of subjective or objective provocation, the trial court did not err in failing to instruct on voluntary manslaughter based on heat of passion.

There was no evidence Corona was actually provoked. The only evidence of Corona's demeanor or emotional state at the time of the shooting was Huerta's statement in his police interview that he heard Corona and Barela arguing. Huerta initially thought "everything was cool" despite the argument, until he heard Barela call Corona a "bitch" and challenge Corona to "take [him] out." While there was circumstantial evidence Barela was angry with Corona, there was no evidence Corona "was subjectively roused to 'the actual influence of a strong passion'" or experienced "'"[v]iolent, intense, high-wrought or enthusiastic emotion"'" . . . at the time of the shooting." (*People v. Smith*, *supra*, 4 Cal.5th at p. 1166; see *People v. Vargas*, *supra*, 9 Cal.5th at p. 828 [trial court did not err in failing to instruct sua sponte on voluntary manslaughter because the witness's "scant evidence regarding the struggle would not permit a reasonable jury to conclude that defendant acted under the influence of a strong passion inflamed by the victim, nor that this was the sort of fight that would lead an ordinary person to act rashly and without deliberation and reflection, and from a heat of passion rather from judgment"].) Moreover, after Barela made these statements, Huerta had time to walk 105 feet (120 - 15) toward Corona and Barela, and Corona had time to look at Huerta and then back at Barela before shooting Barela, suggesting that Corona's reaction to Barela's words hardly "bypassed his thought process to such an extent that judgment

9

could not . . . intervene." (*People v. Beltran*, *supra*, 56 Cal.4th at p. 949; see *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 ["'[i]f sufficient time has elapsed for one's passions to "cool off" and for judgment to be restored,' malice is not negated"].)

Corona argues his two prior confrontations with Barela, one a month and the other a few days before the shooting, showed Corona "acted under the influence of heat of passion." The two prior altercations between Corona and Barela, however, quickly de-escalated and did not become physical. More important, the weeks and days between the prior arguments and the shooting were more than enough time for Corona to "cool off" and for any passion or emotion he may have had to subside. (See *People v. Beck and Cruz, supra*, 8 Cal.5th at p. 649 ["'""if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter"'""]; *People v. Beltran*, *supra*, 56 Cal.4th at p. 951 ["'if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter'"]; *People v. Daniels* (1991) 52 Cal.3d 815, 868 [for a killing to be manslaughter, it must be "'suddenly as a response to the provocation, and not belatedly as revenge or punishment'"]; see, e.g., *People v. Rangel* (2016) 62 Cal.4th 1192, 1225 [two-week period between when the victim shot at the defendant's son and when the defendant killed the victim was sufficient for "'""passion to subside and reason to return"'""]; *People v. Moye* (2009) 47 Cal.4th 537, 551 [physical fight the evening before the defendant beat victim to death with a baseball bat "did not itself constitute legally sufficient provocation to require instruction on sudden quarrel/heat of passion voluntary manslaughter"].)

10

Nor was the verbal exchange of insults and taunts between Barela and Corona the day of the shooting ""sufficient to cause an '"ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."""" (*People v. Landry* (2016) 2 Cal.5th 52, 97.) Barela taunted Corona and called him a name. Such verbal insults and challenges do not provoke ordinary people of average disposition to act rashly or without reason. (See *People v. Enraca* (2012) 53 Cal.4th 735, 759 [insults or challenges are not "sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter"]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 ["a voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words"]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [taunting the defendant that, if he had a weapon, he "should take it out and use it" and calling the defendant a "'mother fucker'" were not enough to cause an average person to become so enraged as to lose all reason and judgment]; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1073 [""A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter.""]; *People v. Najera* (2006) 138 Cal.App.4th 212, 226 [using a homophobic slur "would not drive any ordinary person to act rashly or without due deliberation and reflection"].)

11

B.   *Corona Was Not Denied Effective Assistance of Counsel*

Huerta testified at trial that Corona was a member of the Bell Gardens Locos gang, that the name of his gang was "written on his face," and that Corona went by the name Flaco.  Rice testified Corona taxed her because she had been selling drugs "in his gang area."  Corona argues his trial counsel was ineffective because he did not ask the court to sanitize this testimony by requiring the witnesses to characterize the taxing as "simply related to the world of drug sales," rather than an "activity related to a *gang*, per se."  Corona also argues his trial counsel should have "sought an instruction limiting the use of" the gang evidence, although he does not suggest what that instruction should have been.

1.   *Applicable Law and Standard of Review*

"A criminal defendant's federal and state constitutional rights to counsel [citations] include the right to *effective* legal assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  To show ineffective assistance of counsel, the defendant must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense.  (*People v. Cowan* (2010) 50 Cal.4th 401, 493, fn. 31.)  To show deficient performance, the defendant must show counsel's representation fell below an objective standard of reasonableness "as measured by "'prevailing professional norms.'"" (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)  To show prejudice, the defendant must show "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine

12

confidence in the outcome.'" (*Id.* at p. 1086.) "'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1051.) "The defendant has the burden on appeal to show by a preponderance of the evidence that he or she was denied effective assistance of counsel and is entitled to relief." (*People v. Pettie* (2017) 16 Cal.App.5th 23, 81.)

On direct appeal, "a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) "Judicial scrutiny of counsel's performance must be highly deferential, and . . . [a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland v. Washington* (1984) 466 U.S. 668, 669 [104 S.Ct. 2052]; see *People v. Weaver* (2001) 26 Cal.4th 876, 928 ["'even "debatable trial tactics" do not "constitute a deprivation of the effective assistance of counsel"'"]; see also *Harrington v. Richter* (2011) 562 U.S. 86, 105 [131 S.Ct. 770] ["The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."].)

## 2. *Corona Has Not Demonstrated His Trial Counsel Provided Ineffective Assistance*

California courts have recognized the potential prejudicial effect of gang evidence and have "condemned the introduction of such evidence 'if only tangentially relevant, given its highly inflammatory impact.'" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.) Nevertheless, "'[g]ang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it."'" (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964; see *People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) Gang evidence is also relevant to a witness's credibility. (*People v. Ayala* (2000) 23 Cal.4th 225, 277; *Samaniego*, at p. 1168.)

Here, the limited gang evidence the prosecution introduced was relevant to motive and witness credibility. The entire confrontation between Corona and Barela arose from Corona's conduct in imposing a tax on Rice to enforce the Bell Gardens Locos gang's claim to territory. It was Barela's response to that quintessential gang activity that led to the shooting. Any objection to the admission of this evidence (which Corona does not even argue his trial counsel should have made) or request to scrub it of its gang-related context would have been meritless. (See *People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1193

14

["failure to object to the admission of evidence is not ineffective assistance where 'there was no sound legal basis for objection'"].)

The record also shows counsel for Corona had rational, tactical reasons for not seeking to sanitize the gang evidence in this case:  He wanted to show Barela was a gang member and Corona had reason to fear him.  Counsel for Corona acknowledged before trial that gang evidence "may come up," but he made no effort to exclude, sanitize, or limit the jury's consideration of such evidence.  During the trial, counsel for Corona questioned Huerta about Barela's gang ties to show that Barela had enemies who may have had a motive to, and did, kill Barela.  (See *People v. Lewis* (2001) 25 Cal.4th 610, 661 [counsel's performance was not deficient where "counsel could reasonably have viewed the [witness's] testimony as further support for the defense position"].)  Counsel for Corona also used gang evidence in his closing argument to undermine Huerta's credibility.  Counsel for Corona argued that, while Huerta was in custody awaiting trial on other charges, the police "gang detail show[ed] up" wanting to get "gang guys" like Corona "off the street" and told Huerta that if he "give[s] up" Corona he would be released and "cited out."

Finally, Corona has not demonstrated prejudice.  There is no reasonable probability that, had Corona's trial counsel convinced the court to require Huerta and Rice to use the phrase "world of drug sales" rather than "gang," the result of the trial would have been any different.  "Drug world" isn't much better than "gang world."  And, as the People point out, the "proposed sanitization would . . . have been pointless" because Corona had the name of his gang tattooed on his face, and any reasonable jury would have connected drug sales with gang activity.

15

C.  *The Trial Court Did Not Err in Ordering Corona To Pay Interest on Restitution Paid to the Victim Compensation Board*

The trial court ordered Corona under section 1202.4, subdivision (f), to pay $1,359.85 in restitution to one of Barela's relatives, plus 10 percent interest from the date of sentencing, for out-of-pocket funeral expenses. Corona does not challenge this order. The trial court also ordered Corona to pay $7,500 in restitution to the Victim Compensation Board, which paid that amount from the Restitution Fund to Barela's family for funeral expenses, plus 10 percent interest from the date of sentencing. Corona does not challenge the order requiring him to deposit $7,500 in the Restitution Fund, but he does challenge the order requiring him to pay 10 interest on that amount. Corona argues that, because the Board is not a "victim" within the meaning of section 1202.4, subdivisions (f) and (k), it is not entitled to interest.[2]

When interpreting a statute, our "'fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's

---

[2]  We review an order of victim restitution for abuse of discretion, unless the argument "hinges on an issue of statutory interpretation, which we review de novo." (*People v. Montiel* (2019) 35 Cal.App.5th 312, 318; *People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1084.) In addition, while a defendant usually must object to a restitution award to preserve the issue for appeal (*People v. Gonzalez* (2003) 31 Cal.4th 745, 755), where, as Corona argues and the People concede, the court imposed an unauthorized sentence, the failure to object is not a forfeiture. (*People v. Mendez* (2019) 7 Cal.5th 680, 716;  *People v. Ruiz* (2018) 4 Cal.5th 1100, 1104, fn. 2; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1047-1048.)

16

purpose.' [Citations.] 'Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning.' [Citations.] 'If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.'" (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105-1106; see *In re C.H.* (2011) 53 Cal.4th 94, 100.)

The statutory language does not support Corona's interpretation. Section 1202.4, subdivision (f), provides that the court must order the defendant to make "full restitution" to the victim. Section 1202.4, subdivision (f)(3), states that the court must set the "dollar amount" of restitution "to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct," including medical expenses, lost wages, payment for the value of lost or damaged property, and "[i]nterest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss, as determined by the court."

Section 1202.4, subdivision (f)(2), provides that "the amount of restitution ordered pursuant to this subdivision shall not be affected by the indemnification or subrogation rights of a third party," such as an insurer or the Board. Among the things included in the amount of restitution that indemnification and subrogation rights (whether of an insurer or the Board) do not affect, and that the court must award, is interest at 10 percent. (§ 1202.4, subd. (f)(3)(G).) This is true even if the defendant has to pay some or all of the restitution amount to the Board for

17

deposit in the Restitution Fund.  Section 1202.4, subdivision (f)(2), provides that restitution "ordered pursuant to this subdivision shall be ordered to be deposited" in the Restitution Fund to the extent a victim has received assistance from the Board.  Under section 1202.4, subdivision (f)(3)(G), restitution ordered "pursuant to this subdivision" (i.e., section 1202.4. subdivision (f)) must include 10 percent interest.  (See *In re S.E.* (2020) 46 Cal.App.5th 795, 809-810 ["[w]here a victim, or, as in this case, the state, pays out money for expenses incurred by the victim as a result of a defendant's . . . criminal conduct, the use of that money for other purposes is lost until reimbursed by the payment of restitution," and under section 1202.4, subdivision (f)(3)(G), "the Legislature has determined 10 percent per annum is appropriate recompense for this loss of use"]; *People v. Pangan* (2013) 213 Cal.App.4th 574, 581 ["the point of a restitution award is that the crime perpetrator is indeed responsible to pay the award *now*, which is why the award carries interest from the date of sentencing or date of loss"].)

Corona argues he does not have to pay interest on amounts paid to the Board because the Board is not a "victim" within the meaning of section 1202.4, subdivision (k).  Corona contends section 1202.4, subdivision (k), which defines "victim" for purposes of restitution under section 1202.4 to include family members, direct victims of a crime, and persons who receive assistance from the Restitution Fund, does not list the Board as a "victim."  Corona's conclusion, however, does not follow from his premise.  Section 1202.4, subdivision (k), does not include the Board as a victim; the victim is the person the Board assists.  But section 1202.4, subdivision (f), requires the defendant to pay full restitution to the victim, including 10 percent interest, even if a

18

victim has received assistance from the Restitution Fund, not because the Board is a "victim," but because section 1202.4, subdivision (f)(3)(G), requires the restitution award to include 10 percent interest.  The "restitution ordered pursuant to" section 1202.4, subdivision (f), always reimburses the victim or victims, even if part of the restitution amount is "deposited" in the Restitution Fund.  As section 1202.4, subdivision (f)(2), makes clear, the court orders full restitution to the victim, including 10 percent interest, and the Board receives satisfaction of its indemnification or subrogation rights when the defendant makes a deposit in the Restitution Fund.  In criminal restitution orders, "there is no escaping the time value of money."  (*People v. Pangan, supra,* 213 Cal.App.4th at p. 582.)

Corona also argues that "the purpose of restitution is to repair actual 'loss,' not to provide a windfall to victims or to state agencies."  But under Corona's theory, the convicted defendant would receive a windfall when the Board provides assistance to victims of the defendant's criminal conduct.  That unreasonable interpretation of the statute penalizes the state for providing financial assistance to crime victims and rewards the defendant whose crimes caused those victims economic loss.  (See *People v. Bullard* (2020) 9 Cal.5th 94, 106 [courts must "choose a reasonable interpretation that avoids absurd consequences that could not possibly have been intended"]; *People v. Loeun* (1997) 17 Cal.4th 1, 9 ["'Interpretations that lead to absurd results or render words surplusage are to be avoided.'"].)  Relieving the defendant of his or her obligation to pay full restitution, including interest, would allow the defendant to benefit from a state program established to assist those whom the defendant has harmed.  (See *People v. Evans* (2019) 39 Cal.App.5th 771, 778

19

["We see no reason that defendant should receive a windfall—and the Restitution Fund should suffer a loss—simply because the victims exercised their right to apply to the . . . Board rather than waiting for the victim restitution order."].)

*People v. Martinez* (2005) 36 Cal.4th 384 and *People v. Wardlow* (1991) 227 Cal.App.3d 360, cited by Corona, are distinguishable. Neither case involved payment of interest as restitution for victims' economic losses or deposits in the Restitution Fund after victim assistance from the Board. In *Martinez* the Supreme Court held that, although a state agency could not recover from the defendant the costs of disposing hazardous substances recovered at a crime scene under section 1202.4 because the agency was not a direct victim under section 1202.4, subdivision (k), the agency could recover those costs under Health and Safety Code section 11470.1 or 11470.2. (*Martinez*, at pp. 393-394.) As stated, the Board is not seeking restitution as a direct victim; it is seeking reimbursement because it provided assistance to a direct victim. In *Wardlow* the court held that, although the trial court could not impose as a condition of probation restitution by a defendant convicted of child molestation to Medi-Cal or the Victim's Assistance Fund for the costs of the victim's psychological treatment under section 1203.1g, the court could "order a defendant convicted of child abuse or neglect to reimburse a law enforcement agency for the costs of any medical examinations of the victim" under section 1203.1h. (*Wardlow*, at pp. 365, 368, 371.) Like *Martinez*, *Wardlow* involved a different statutory scheme, and the court in *Wardlow* emphasized that "section 1203.1g must be read in light of the statutory scheme for probation conditions . . . ." (*Id.* at

20

p. 371.)[3] Moreover, *Wardlow* was decided in 1991, before the Legislature enacted section 1202.4, subdivision (f)(2), in 1996. (See Stats. 1996, ch. 629, § 3.)  Finally, as the People point out, applying *Wardlow* to section 1202.4 as Corona suggests would preclude the Board from receiving any money, let alone interest, from the defendant, which would eviscerate section 1202.4, subdivision (f)(2).  (See *People v. Korwin* (2019) 36 Cal.App.5th 682, 685 [courts should reject an interpretation of a statute that "is contrary to both the plain meaning of the statute and its purpose"]; *In re Kacy S.* (1998) 68 Cal.App.4th 704, 709 [courts "may not, under the guise of construction, rewrite" a statute or "ignore the plain meaning of its terms"].)

---

[3] In particular, the court in *Wardlow* observed there "would be no need for [section 1203.1h] authorizing the reimbursement of law enforcement agencies for medical examinations if section 1203.1g were construed . . . to encompass indirect victims and government agencies which made payments for a child abuse victim's medical or psychological treatment."  (*People v. Wardlow, supra*, 227 Cal.App.3d at p. 371.)

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.