Filed 9/28/22  P. v. Heard CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHARLES HEARD,<br><br>        Defendant and Appellant. | A161599<br><br>(San Francisco County<br>Super. Ct. Nos. SCN210246,<br>CT2429070) |

In 2010, appellant Charles Heard (Appellant) was convicted of the first degree murder of Richard Barrett (Pen. Code, § 187, subd. (a))[1] and the attempted second degree robbery of Barrett (§§ 211, 664).  In 2012, this court affirmed.  (*People v. Heard* (Oct. 29, 2012, A130983) [nonpub. opn.].)  Appellant now appeals from the denial of his section 1485.55, subdivision (b) motion for a finding of factual innocence.  We reverse.

PROCEDURAL BACKGROUND

Following a jury trial, Appellant was convicted of murdering and attempting to rob Richard Barrett (Barrett).  The jury found not true allegations that Appellant personally and intentionally used a firearm (§ 12022.53, subd. (d)).  The jury was unable to reach a verdict on charges

_____

[1] All undesignated statutory references are to the Penal Code.

that Appellant possessed a firearm as a felon (§ 12021, subd. (a)(1)) and participated in a criminal street gang (§ 186.22, subd. (a)), or on gang enhancement allegations. Appellant was sentenced to 25 years to life in prison. In 2012, this court affirmed the judgment. (*People v. Heard, supra,* A130983.)

In August 2014, a federal grand jury issued a 22-count indictment charging Appellant and several codefendants with, among other counts, conspiracy to conduct the affairs of an enterprise—a criminal street gang—through a pattern of racketeering activity (18 U.S.C. § 1962, subd. (d)). The indictment alleged the murder of Barrett as an overt act in furtherance of the conspiracy. The indictment also charged Appellant and a codefendant with two other murders (18 U.S.C. § 1959, subd. (a)(1)). In March 2018, a jury convicted Appellant of conspiracy, the two other murders, and a firearm charge. The federal district court sentenced Appellant to four life terms in prison, to be served concurrently with each other and his state sentence.

In November 2018, Appellant filed a combined petition for writ of habeas corpus and for resentencing under section 1170.95. Among other claims, Appellant alleged that newly discovered evidence—gang expert testimony in the federal prosecution that Appellant was not one of two men shown in a video the night of the Barrett murder—established that he was not one of the assailants and that the prosecution's failure to provide that information to the defense at the state trial violated *Brady v. Maryland* (1963) 373 U.S. 83.

In February 2019, the trial court ordered the prosecution to show cause why Appellant was not entitled to relief. Following a multi-day evidentiary

hearing in March 2020,[2] the court granted Appellant's petition for writ of habeas corpus on *Brady* grounds and vacated his convictions and sentence. The prosecution stated its intention not to retry Appellant, and the court granted the prosecution's motion to dismiss the case.

In April 2020, Appellant filed a motion for a finding of factual innocence (§ 1485.55, subd. (b)). In August, the trial court denied the motion. The present appeal followed.

FACTUAL BACKGROUND

Evidence at State Jury Trial[3]

Richard Barrett was shot to death on the corner of Broadway and Kearny Street in the North Beach area of San Francisco in the early morning hours of November 25, 2008.

*Eyewitness Francis S.*[4]

At the time of the shooting, Francis S., who was visiting San Francisco from Texas, was standing outside a bar with colleagues. She saw Barrett being wrestled from behind by two men who were "clawing" and "pulling" at his upper chest, around his shoulders, "neck area," and shirt. The men shoved Barrett into a wall, but Barrett was able to pull away and run. One of the assailants, who had a gun, ran after Barrett, toward the corner where Francis S. was standing. This man was a little taller than Barrett and had

---

[2] In February 2020, Appellant withdrew the petition for resentencing under section 1170.95.

[3] This summary is based in part on this court's decision in *People v. Heard, supra,* A130983.

[4] Francis S. testified at the federal trial under her married name, but she was referred to as Francis S. during the proceedings on the factual innocence motion below, and the parties refer to her as Francis S. in their briefs on appeal. We do so as well. No disrespect is intended.

3

gold in his mouth.[5] Francis S. did not get a good look at the other assailant. Francis S. ducked to get out of the way, heard shots fired, and saw the flash from the gun. The shooter was standing next to her and she had a clear look at his face. The shooter then turned and ran down Kearny Street.

On January 8, 2009, a police officer showed Francis S. two photo lineups at her Texas home. Francis S. did not identify anyone in the first group of photos; she immediately identified Appellant in the second group of photos. At that time, she was 95 percent sure or "pretty sure" he was the shooter.

The preliminary hearing took place in October 2009. Francis S. identified Appellant as the shooter. When Appellant opened his mouth revealing a gold grill or gold crowns, Francis S. said she was 100 percent sure he was the shooter. At trial in May 2010, Francis S. again identified Appellant as Barrett's shooter. Francis S. was also shown still photos from surveillance videos and said they depicted the two people who attacked Barrett.

*Eyewitness Duane R.*

Another eyewitness, Duane R., testified Barrett was wearing a diamond-encrusted pendant on a chain on the outside of his clothing the night of November 25, 2008. Duane R. saw two young Black men wearing hoods approach Barrett. The men pushed him up against the wall of a bar and reached towards his chest area. Barrett pushed the men away and ran around the corner. The two men pursued. Duane R. heard two gunshots and saw the two men run back around the corner and past him. Duane R.

---

[5] As explained below (pp. 21-22, *post*), Francis S. originally said the shooter had a gold tooth; she later testified he had gold teeth, but only after hearing an officer who knew Appellant refer to gold "teeth."

4

followed them and saw them jump into the back seat of a dark-colored sedan, which sped off. Duane R. flagged down a police officer, reported the shooting, and described the getaway car.

On December 10, 2008, Duane R. was interviewed by police officers and shown two groups of photographs. In the second group of six photos, Duane R. picked out Appellant's photo. He said, "Kind of maybe like maybe the shorter guy that had the black hood on . . . but I don't know if that was him or not, but his features kind of, type of guy I saw." Duane R. also said he did not see the faces of the two assailants and did not see a gun. At trial, Duane R. said he was not able to identify either of Barrett's assailants.

*The Getaway Car*

Around 1:00 a.m., following the shooting, police officers pursued a car matching the description of the getaway car at high speeds along city streets. They eventually lost it when it drove onto the freeway. The vehicle was described as a dark gray American car with possible front-end damage.

On November 29, 2008, a gray Nissan Maxima with front-end damage, registered to a Julius Hughes, was towed. One of the pursuing officers identified it as the car he chased following the shooting. At trial, Duane R. said the Maxima resembled the getaway car. A police officer testified the Maxima was in Appellant's possession when the officer detained Appellant on November 19, six days before Barrett's murder.

*Other Prosecution Evidence*

An examination of the records for a cell phone seized from Appellant revealed the phone was in the general vicinity of the Barrett murder around the time of the murder. Appellant had previously provided the telephone number for the seized cell phone to law enforcement and family services, and voicemail messages had been left for him at that number. The seized phone's

5

subscriber was Appellant's girlfriend, who had the same San Francisco address that Appellant had listed on pawnshop tickets.

On July 16, 2008, four months prior to the Barrett shooting, the Federal Bureau of Investigation (FBI) recorded a phone call from a Gary Owens, Jr. to the phone number of Julius Hughes. The recipient of the call handed the phone to Appellant. Owens and Appellant talked about strong-arm robberies, narcotics sales, and buying and selling jewelry. Appellant told Owens he had sold a chain, medallion, watch, and ring for "15 racks," meaning $15,000. The FBI interpreted Appellant's various statements to Owens to mean that Appellant was talking about robbing people of their jewelry and giving advice about robbing someone, and suggesting Owens steal expensive jewelry at a Sacramento "club" owned by a former professional basketball player, where Appellant had stolen a black medallion worth $25,000.

In December 2008, Reginald T. was robbed after he left a club in San Francisco at approximately 2:00 a.m. He was wearing a white gold chain and attached pendant in the shape of the State of California valued at $22,000, as well as a wristwatch valued at $15,000. Three assailants dressed in black hoodies approached him. One of the assailants, identified by Reginald T. at trial as Appellant, pointed a gun and said, "Come up off the jewelry and the money." Reginald T. gave Appellant his pendant and chain, watch, cell phone, and about $400 in cash. Appellant was arrested on December 18. The arresting officer searched Appellant's cell phone and found photos on it of the stolen chain and pendant. The officer also seized keys to a rental car. A search of the rental car turned up the stolen chain and pendant.

When Appellant was arrested on December 18, 2008, he was wearing jeans with horseshoes stitched on the back pockets. There was testimony a

6

surveillance video from the night of Barrett's murder showed one of the presumed assailants wearing that type of jeans.

The prosecution's gang expert testified Appellant frequently associated with Hughes and other members of the Central Divisadero Players (CDP), a gang in San Francisco's Western Addition. The CDP's primary activities were narcotics sales, robbery, murder, and illegal possession of firearms. The expert stated Appellant engaged in gang-related crimes or activities between 2003 and 2008 and was an active participant in the CDP.

*Defense Evidence*

Eyewitness Mike R. testified he was outside the bar where Barrett was killed. He heard scuffling and saw a man holding a gun against Barrett's chest. After seeing the gun, Mike R. ran back to the bar. When police showed him a photo lineup that included Appellant's photo, Mike R. did not identify anyone.

Eyewitness David S. testified he was outside the bar when he saw two men push Barrett up against the building. When Barrett got away, one of the assailants chased him around the corner holding a gun. David S. said Appellant was not the person who chased Barrett. After hearing gunfire, he went to help Francis S. He then saw the shooter turn around, grin at him and Francis S., and flee down Kearny Street. David S. said the shooter was "absolutely not" Appellant.

Psychologist Geoffrey Loftus, an expert on human perception and memory testified regarding the possible suggestiveness and unreliability of eyewitness testimony. Dr. Benham Bavarian, a consultant in biometrics identification and an expert in the measurement of facial features, concluded that significant differences existed between measurements taken from photos

7

of Appellant's face and measurements taken from images of the person alleged to be Appellant in the surveillance videos near the murder scene.

*Rebuttal*

A photographic technologist for the FBI and an expert in forensic video and imaging analysis, opined that Dr. Bavarian's methodology and conclusions were unreliable.

Evidence at Federal Jury Trial[6]

*Eyewitness Francis S.*

Francis S. witnessed the Barrett shooting on November 25, 2008. She was eight or nine feet away, got a "good look" at the shooter and saw him "eye to eye." Francis S. also noticed the man had "gold on his front teeth." She admitted she saw him for only a few seconds and did not get a good look at the second assailant.

In January 2009, Francis S. was shown two photo lineups by a Texas constable, and she identified a photo of Appellant as Barrett's shooter. Francis S. was 95 percent certain in her identification. She explained, "In the photograph, his mouth was closed, and I remember seeing the gold on the front of his teeth the night of the murder, so without being able to see that, I wasn't a hundred percent, but I was still 95 percent certain."

Francis S. also testified she identified Appellant as the shooter at the October 2009 state court preliminary hearing and at the state trial. On cross-examination, Francis S. admitted she told the police on the night of the murder and the Texas constable that the shooter might have had one gold tooth, not a gold grill or crowns. When Francis S. saw Appellant at the preliminary hearing, she saw he had a gold grill or crowns, rather than a

---

[6] We only summarize the relevant portions of the federal trial testimony of eyewitness Francis S. and the prosecution's gang expert.

8

single gold tooth. Francis S. said the fact that Appellant had a gold grill or crowns "may not have been consistent with what I said," but it "was consistent with what I saw."

*Gang Expert Sergeant Damon Jackson*

Sergeant Damon Jackson testified for the government in the federal case as its gang expert. Sergeant Jackson was a member of the San Francisco Police Department's (SFPD) Gang Task Force. His area of expertise focused on the gangs based in the Western Addition neighborhood. From 2003 to 2007, he was a patrol officer assigned to the police district responsible for the Western Addition and Fillmore neighborhoods. From this work, Sergeant Jackson got to know the gang members and other members of the community through his daily contact with them. From 2003 to 2007, he was involved in hundreds of gang-related investigations.

In 2007, Sergeant Jackson joined the SFPD Gang Task Force, assigned to the Western Addition. Sergeant Jackson testified he "knew everything that was possible" to know about gang members and gang activity in the Western Addition. In 2010, Sergeant Jackson joined the SFPD's Violence Reduction Team, where he focused on investigating the same sorts of crimes he had as a member of the task force. In December 2012, the officer was promoted to the rank of sergeant and he was transferred to the Tenderloin Special Investigations Team for approximately six months; afterwards he returned to the gang task force, again assigned to the Western Addition.

Sergeant Jackson previously had been qualified as an expert on Western Addition gangs, and had testified regarding gang-related matters. Viewing video surveillance was part of his duties; these videos allowed him to corroborate information, including which gang members were associating

9

with each other and who was committing crimes.  He had contacted every alleged or validated gang member in the Western Addition, and encountered the majority "on a daily basis for years" through arrests, detentions, consensual contacts, and custodial interviews.

Sergeant Jackson testified he knew what Appellant looked like because he had known Appellant for years and had also seen him in photos and videos.  Sergeant Jackson also knew gang members Gregory Walker and Dennis Anderson for years, and had seen them in photos.  Defense counsel played a portion of video depicting the Barrett assailants on Montgomery Street and asked Sergeant Jackson if he knew the two men shown in the video.  The officer identified the men as Walker and Anderson and affirmatively testified neither man was Appellant.

Evidence at State Habeas Corpus Evidentiary Hearing

*Dr. Kathy Pezdek*

Dr. Kathy Pezdek, a cognitive scientist at Claremont Graduate University, testified as an expert in memory and eyewitness identification.  She has published extensively on scientific research in the area of eyewitness identification and memory.

Dr. Pezdek explained that memory "does not work like a camera."  Instead, memory processing is divided into three stages: the perception stage, the storage stage, and the identification stage.  Based on Dr. Pezdek's review of the records in the case, she opined that various "psychological factors … cast doubt on the accuracy of [Francis S.'s] eye witness identification" of Appellant.

First, Francis S. had "brief exposure time" to the shooter.  Dr. Pezdek explained, "as you give people less time to look at a face, the probability of a

10

correct identification goes down and the probability of a misidentification goes up."

Second, there were distractions, including a fight, cars driving by, and the witness ducking.  Also, a witness's ability to make an accurate identification decreases when there is more than one perpetrator.

Third, studies show that when a perpetrator is holding a weapon, the witness's ability to make an accurate identification is "significantly reduced" because "when people are looking at a crime if there is a weapon present during the event people tend to focus on that weapon."  Francis S. gave a specific description of the shooter's firearm, which "indicates she was looking at that weapon."

Fourth, a "large number[] of studies" have found memory is "much worse under high levels of stress."  Francis S. was "observing a shooting at a close range … that … frightened her to the point that she ducked. . . .  You don't do that unless you're under a high level of stress."

Fifth, research has "shown that where any part of a suspect's head, hairline or anything is covered … it impairs the accuracy of a later identification."  There was testimony the assailants wore hoods.

Sixth, witnesses more accurately identify "people of their own race or ethnicity than people of [a] different race or ethnicity. [¶] This has been demonstrated around the world and under all kinds of conditions . . . ."  Here, Francis S., a white woman, witnessed an event involving two African American perpetrators.  Where a person looks at "multiple cross-race faces," there is "an even stronger cross-race effect."

Seventh, Francis S. first identified Appellant in a photographic lineup more than six weeks after the shooting.  That was a "significantly long time delay for a face that was seen only for a matter of seconds" because memory

11

accuracy decreases with the passage of time and the "decline in the accuracy of identifications [is] much steeper over time for [a] face seen for a brief[] period of time."

Eighth, Dr. Pezdek discussed the importance of law enforcement admonishing an eyewitness that a suspect may or may not be among the photos in a photo lineup. "That's very important because they should know that they can pick somebody out of that lineup or they could say, nobody, I don't recognize the guy." Where an officer tells an eyewitness to choose the photo of someone the eyewitness recognizes, the eyewitness may engage in a process of elimination, which "always leads to more misidentifications." The Texas officer improperly directed Francis S. to "choose a person that she thought she recognized," thereby undermining an earlier proper admonishment. The statement, " 'choose a person that you thought you recognized' is the opposite of 'don't feel compelled to make an identification if you don't identify anyone.' "

Ninth, "post[-]event contamination" can negatively affect the accuracy of eyewitness identification. Because "[m]emory is imprecise," post-event information can "morph[]" with the original memory. In this case, hours after the event, Francis S. described the assailant as possibly having " 'had a gold cap on one of his teeth.' " Subsequently, after she identified Appellant, Francis S. spoke to a police officer familiar with Appellant who instead referenced gold "teeth." That reference to "gold teeth, plural," constituted post-event information that may have contaminated Francis S.'s original memory. Such post-event "morphing" occurs unconsciously and is permanent.

Tenth, Dr. Pezdek discussed the "bias of an in[-]court identification." She explained, "[B]est practices in testing eyewitness memory do[] not occur

12

in court." By the time of trial, an eyewitness will have observed a defendant multiple times in court. The courtroom setting also suggests to the witness that the authorities have strong corroborating evidence. In-court identifications are "important for legal reasons, but . . . it's a lousy test of eye[]witness memory."

In addition, with respect to the relationship between confidence in an identification and its accuracy, Dr. Pezdek testified that "high-confident responses are likely correct responses at the time of the initial identification only and when that occurs in relatively close proximity to the event itself."

*Sergeant Damon Jackson*

As he had at the federal trial, Sergeant Jackson testified at length about his many years of experience as a police officer in the Western Addition, including as a member of the SFPD gang task force.

Sergeant Jackson had known Appellant since 2004 or 2005, and had encountered him many times between then and the time of Appellant's arrest for the Barrett murder in 2009. He had spoken with Appellant on the street in consensual encounters and in the course of criminal investigations, arrests, and searches, and Sergeant Jackson had viewed Appellant in photographs and video footage. The officer believed he was "very familiar" with Appellant. The officer also was "very familiar" with Dennis Anderson and Gregory Walker. He had known them since around 2005, and had encountered them regularly after that. Sergeant Jackson had seen the men in both photographs and video footage, and he "absolutely" knew them well enough to identify them in surveillance video. After viewing the same Montgomery Street video surveillance footage he had viewed at the federal trial, Sergeant Jackson again testified the men in the video were Walker and Anderson.

13

Sergeant Jackson also described his first viewing of the Montgomery Street video during the investigation of the Barrett murder. He was not the lead investigator, but he and three or four other gang task force members were called to the district attorney's office. They "huddled" around a computer monitor to view the surveillance video footage. Sergeant Jackson was not able to positively identify the two people in the video. As a group, the officers believed the two men "could have been" two of three people: Appellant, Anderson, or Walker. In Sergeant Jackson's view, a " 'positive ID' " meant he was "confident and with a hundred percent accuracy that those people are who [he] identified them to be." In explaining his failure to "positively" identify the assailants, the officer stated, "[f]or whatever reason, whether it was the resolution quality of the monitor, whether it was, I don't know, the video, I can't explain it . . . ." The same video shown at the federal trial "appeared to be" of better quality.

*The Ruling on the Petition for Writ of Habeas Corpus*

The trial court stated, "I think the notion that multiple members of the [SFPD] questioned whether or not [Appellant] was depicted in the video at a time prior to his arrest, prior to the preliminary hearing, in the presence of the prosecutor and this was not disclosed to the defense is very troubling to me and I think it's plainly a *Brady* violation." The court continued, "Coming into this proceeding I was skeptical about this claim. That was in part because all I had was this very brief transcript from Sergeant Jackson in the federal trial. But once I heard him and heard his extensive history in the Western Addition as a patrol officer, as a detective, as a member of the Gang Task Force and his daily contact with [Appellant], Mr. Anderson, Mr. Walker, and the other people who live in that neighborhood, I found his identification of those two men very, very convincing and credible. And I can only imagine

14

that a panel of lay people empanel[]ed on a jury would have as well. [¶] And that is enough for me to make the ruling granting this petition." With respect to Francis S.'s testimony, the trial court acknowledged it "could be very powerful evidence, but even at trial it was attacked using the science that has been developed about eye witness testimony."

Arguments and Ruling on the Factual Innocence Motion

In his written motion and at the hearing below, Appellant argued that Sergeant Jackson's testimony in the prior proceedings established by a preponderance of the evidence that he was factually innocent of the Barrett murder and attempted robbery. Appellant emphasized the depth of the officer's familiarity with Appellant, Walker, and Anderson, and the absence of a motive for the officer to aid Appellant. Appellant contrasted the officer's testimony with Francis S.'s testimony, which had been shown to be "unreliable" by Dr. Pezdek's explanation of the research regarding eyewitness identification. Appellant also pointed out that another eyewitness, David S., contradicted Francis S.'s identification, testifying that Appellant was "absolutely not" the shooter.

In opposing the request for a finding of factual innocence, the prosecution relied on Francis S.'s testimony that Appellant was the shooter, which "was based on her seeing [Appellant] in person." The prosecution also relied on other evidence that allegedly corroborated Francis S.'s testimony, including evidence Appellant's phone was near the scene of the shooting and he was involved in other jewelry robberies.

In denying the motion, the trial court stated, "I do not believe that the preponderance of evidence standard has been satisfied here. And this opinion of Sergeant Jackson is definitely a strong piece of evidence. But in a case where the eyewitness is unwavering and is positive that it's [Appellant]

15

and with additional supporting corroborating evidence that his cell phone was in the area, … I do not believe that it's been shown by a preponderance of the evidence that he did not commit the offense. It's a close case, but it doesn't make it for me."

## DISCUSSION

Appellant contends the trial court erred in denying his motion for a finding of factual innocence under section 1485.55, subdivision (b). Appellant argues Sergeant Jackson's "unassailable testimony identifying Anderson and Walker as the assailants" had far more evidentiary weight than Francis S.'s "unreliable" eyewitness testimony that Appellant was the shooter. He faults the trial court for disregarding the weight of the officer's testimony, which the court itself had previously declared to be "very, very convincing and credible." Appellant also faults the court for disregarding the unchallenged scientific evidence that Francis S.'s identification was "grossly unreliable." Respondent argues that, although Sergeant Jackson's testimony was very strong, Francis S.'s identification of Appellant as the shooter also was strong, and corroborated by other evidence in the record. Respondent does not argue the trial court's ruling can be affirmed under any other theory. We conclude Appellant made the showing required for a finding of factual innocence.

I.    *Legal Standard and Standard of Review*

"[I]f the court grants a writ of habeas corpus and did not find the person factually innocent in the habeas corpus proceedings, the petitioner may move for a finding of factual innocence by a preponderance of the evidence that the crime with which he or she was charged was either not committed at all or, if committed, was not committed by him or her." (§ 1485.55, subd. (b).) The question in claims of factual innocence " 'is not whether there is sufficient evidence to establish culpability, but whether or

16

not claimants can establish they are not culpable.' " (*Tennison v. California Victim Comp. & Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1191.)[7]

"Preponderance of the evidence" means that "the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily in number of witnesses or quantity, but in its effect on those to whom it is addressed." (*People v. Miller* (1916) 171 Cal. 649, 652.) "[T]he preponderance of the evidence standard 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence." ' ' " (*Bichai v. DaVita, Inc.* (2021) 72 Cal.App.5th 1126, 1139, quoting *In re Angelia P.* (1981) 28 Cal.3d 908, 919.)

We review the denial of Appellant's factual innocence motion de novo. (*People v. Caldwell* (2018) 29 Cal.App.5th 180, 182.) In doing so, we " 'make[] an original appraisal of all the evidence to decide whether or not [we] believe[]' the outcome should have been different." (*In re George T.* (2004) 33 Cal.4th 620, 634.)[8]

---

[7] Under section 1485.55, subdivision (c), "If the court makes a finding that the petitioner has proven their factual innocence by a preponderance of the evidence pursuant to subdivision (b), the [California Victim Compensation B]oard shall, without a hearing, recommend to the Legislature that an appropriation be made and any claim filed shall be paid pursuant to Section 4904." Section 4904 provides for payments in "a sum equivalent to one hundred forty dollars ($140) per day of incarceration served."

[8] Respondent agrees rulings on factual innocence motions are reviewed de novo, but it suggests some deference to the trial court's ruling is appropriate because the same judge who denied the motion also heard Sergeant Jackson's testimony at the evidentiary hearing on the habeas petition. We need not address that issue, because the trial court stated it found the officer's identification "very, very convincing and credible." Accordingly, the court's ruling was not based on any finding that the officer's testimony was less than fully credible. That is, respondent identifies no

17

II.     *Appellant Made the Showing for a Finding of Factual Innocence*

       A.      *Sergeant Jackson's Testimony*

At the outset, we agree with Appellant that Sergeant Jackson's testimony was strongly persuasive evidence. As Appellant points out, respondent "never challenges or attempts to undermine Sergeant Jackson's credentials or credibility." Respondent acknowledges the officer's familiarity with Appellant, Anderson, and Walker, as well as the trial court's finding that the officer's identification of Walker and Anderson as the men in the surveillance video was "very, very convincing and credible." Although conceding the officer had no reason to favor Appellant, respondent nevertheless argues the testimony was not "unassailable." Respondent suggests the surveillance video "was not of the highest resolution." However, this court has reviewed the video underlying Sergeant Jackson's identification, and the quality is more than sufficient to allow a witness familiar with the persons in the video to identify them. Respondent also points out that Sergeant Jackson failed to conclusively identify the assailants when he first viewed the video in 2008. But the officer testified that the video he first saw appeared to be of lesser quality and that he did not "put too much focus into it because it wasn't my case." Sergeant Jackson also testified, "To my recollection the lighting in the video were such that I couldn't look at it like I do right now and say, 'Dennis Anderson' and 'Gregory Walker.'" Furthermore, the 2008 viewing involved four or five officers huddled around a computer monitor, while the court during the habeas proceeding noted "here in court we've got this big screen and a projector and [the] image is really big." Finally, respondent argues Francis S.'s

_____

express or implied findings adverse to Appellant with respect to that testimony to which this court could defer.

18

identification was more reliable because she "viewed [A]ppellant face-to-face." However, respondent fails to explain why that made her identification more reliable, contrary to Dr. Pezdek's expert testimony that her eyewitness identification was *unreliable*.[9]

The identification of persons in videos and photographs is an admissible form of lay opinion testimony. *People v. Leon* (2015) 61 Cal.4th 569 is directly on point. There, the defendant argued the trial court erred in permitting a police detective to identify him as a person shown in two surveillance videos. The Supreme Court held the testimony was proper, explaining, "A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid.Code, § 800.) '[T]he identity of a person is a proper subject of nonexpert opinion....' " (*Leon*, at p. 601.) Questions about the extent of the witness's "familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony." (*Ibid.*; see also *People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067.) In the present case, as respondent does not dispute, Sergeant Jackson demonstrated a great degree of familiarity with Appellant, Anderson, and Walker, and his identification of Anderson and Walker is properly given great weight. Accordingly,

---

[9] Respondent also points out that eyewitnesses Francis S. and David S. testified Anderson was not the shooter. However, respondent does not claim those eyewitnesses rejected the possibility that Walker was the shooter or that Anderson was the other assailant. In any event, that eyewitness testimony suffered from the problems identified by Dr. Pezdek. And Sergeant Jackson's identification based on his familiarity with the suspects was much more reliable.

respondent fails to identify any basis for doubt regarding the strength of Sergeant Jackson's testimony.[10]

#### B. *Francis S.'s Eyewitness Testimony*

Despite the reliability of Sergeant Jackson's testimony, respondent argues "[t]he evidence that [A]ppellant attempted to rob Richard Barrett and then in the course of that crime shot and killed him was at least as strong as Sergeant Jackson's testimony that [A]ppellant was not one of the assailants." Respondent relies primarily on Francis S.'s eyewitness identification, arguing that she was "unwavering in her identification of [A]ppellant as Barrett's shooter" at both the state and federal trials. But, as the California Supreme Court recently stated, "Contrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' " (*People v. Lemcke* (2021) 11 Cal.5th 644, 647 (*Lemcke*); see also *id.* at p. 665.) Witness confidence is a particularly problematic ground "in a case like this one, where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant." (*Id.* at p. 666.)

Respondent acknowledges the applicability of *Lemcke*, but points out that Dr. Pezdek testified that "high confidence identifications" at the time of first identification "are more likely to be correct than low confidence identifications." However, Dr. Pezdek cautioned that "high-confiden[ce]

---

[10] At oral argument, respondent suggested the verdict in the federal racketeering trial reflected a finding Appellant committed the Barrett murder, despite Sergeant Jackson's testimony. That is not the case. As to Appellant, the verdict form in the federal trial includes findings of guilt on the racketeering charge, murders of two other people, and a firearm use charge. The verdict form contains no specific findings regarding any of the many overt acts listed in the indictment, including the Barrett murder.

20

responses are likely correct responses at the time of the initial identification only and when that occurs in relatively close proximity to the event itself." Because Francis S.'s initial identification occurred six weeks after the incident, *Lemcke's* concerns are fully applicable here. Accordingly, respondent's primary argument in support of the trial court's finding—that Francis S. consistently and confidently identified Appellant as the shooter— is due little weight in evaluating the reliability of her eyewitness identification.[11]

Respondent also appears to suggest the reliability of Francis S.'s testimony is supported by her recollection that the shooter had gold teeth, and Appellant has a gold grill or crowns. However, Appellant points out that on the day of the incident Francis S. told the police the shooter "might have had a gold cap on one of his teeth." Dr. Pezdek testified that "description close in time to the event is most likely to reflect what [Francis S.] saw." Following Francis S.'s identification of Appellant in a Texas photo lineup, a California officer telephoned her and she expressed some uncertainty about her identification. She said, "I would be a lot more certain if I had a little more information about him, I guess, umm, like whether or not he had a gold tooth or a solid cap on his tooth." She said she remembered seeing it on "one" of his front teeth. The officer, who apparently knew Appellant, subsequently

---

[11] To the extent respondent makes a separate argument that Francis S.'s identification was reliable because she made it *repeatedly*, that argument is unpersuasive because " 'once a witness has picked out the accused at the line-up, [she] is not likely to go back on [her] word later on. . .' " (*United States v. Wade* (1967) 388 U.S. 218, 229; see also *State v. Henderson* (2011) 208 N.J. 208, 256 ["Mugshot commitment occurs when a witness identifies a photo that is then included in a later lineup procedure. Studies have shown that once witnesses identify an innocent person from a mugshot, 'a significant number' then 'reaffirm[ ] their false identification' in a later lineup—even if the actual target is present."].)

21

changed the witness's reference to the plural, stating "He had his mouth closed and you remember the shooter having a gold cap or a gold crown on his front *teeth*." (Italics added.)[12] Dr. Pezdek opined that could have "contaminated" Francis S.'s memory of the shooter, explaining, "So she has an imprecise memory that has something like one gold tooth in it. Now later she hears information about gold teeth, plural. . . . [T]hat description is post event information that can contaminate her own original memory . . . and that information is being morphed with her original memory." The expert emphasized, "Once two memories have been contaminated, morphed into each other, you can't separate which one came from the original memory and which one came from the post event suggestion." Respondent offers no basis to reject that expert opinion. Also, respondent points to nothing in the record indicating whether the persons identified by Sergeant Jackson, Walker and Anderson, had gold teeth. The prosecution's gang expert in the state trial testified there were "a lot" of Western Addition gang members with "gold teeth." Accordingly, Francis S.'s recollection regarding a gold tooth or teeth does not meaningfully enhance her credibility.

Notably, respondent fails to rebut any of the other factors identified by Dr. Pezdek that undermined the reliability of Francis S.'s eyewitness identification, including the short time Francis S. had to observe the shooter; the distractions, including the presence of a gun; the stress of the event; the fact that the shooter was wearing a hood; the circumstance that the shooter

---

[12] These details entered the record through the testimony of Dr. Pezdek, who was relating information from a transcript of the call. Francis S. confirmed most of the account in her federal trial testimony, although this court has not seen a portion of her testimony where she was asked about the officer's reference to "teeth." Respondent does not object to reliance on Dr. Pezdek's testimony or dispute that Francis S. first heard about the possibility of gold "teeth" from an officer.

22

was of another race; the delay in the identification; the improper admonition provided by the Texas officer; and the contaminating effect of the in-court observations of Appellant. Respondent does not dispute that Dr. Pezdek's testimony on those points was grounded in scientific studies or that Dr. Pezdek properly applied the scientific findings to the facts of the present case. Accordingly, the record justifies our skepticism of Francis S.'s identification, especially in light of Sergeant Jackson's highly credible identification of the assailants as Anderson and Walker.[13]

C.    *Other Evidence*

Respondent argues other evidence corroborated Francis S.'s identification of Appellant as the shooter.

Duane R., testified he spoke to the police and viewed a photo lineup in December 2008. Duane R. told the police that, while he did not see the faces of the two men who attacked Barrett, "maybe like maybe" a photo of Appellant was "the shorter guy that had the black hood on . . . but I don't know if that was him or not, but his features kind of, type of guy I saw." That identification has little probative value, given its tentativeness, Duane R.'s admission he never saw the assailants' faces, and Duane R.'s inability to identify Appellant at the time of trial. Moreover, eyewitness David S. testified Appellant was "absolutely not" the shooter, "not even close." He also testified that the shooter, who grinned at him before running away, did not have gold teeth. At trial he testified he was looking "directly" at the shooter

---

[13] Yet another reason to be skeptical of Francis S.'s identification is because her description of the shooter's clothing was entirely wrong. At the state trial, she admitted mistakenly telling the police that the shooter had a hat rather than a hood, that the shooter was wearing an unbuttoned short sleeved shirt rather than a hoodie, and that the shooter was wearing plaid pants rather than jeans.

23

and saw the shooter's face "clearly."[14]  Accordingly, on balance, the other eyewitness identification testimony tends to support a conclusion that Appellant was *not* the shooter.

Respondent also asserts that, when Appellant was arrested in December 2008, he was wearing True Religion jeans with stitching of a horseshoe on each back pocket, and that a surveillance video from the night of Barrett's murder showed one of the presumed assailants wearing True Religion jeans.  However, although an officer testified to those assertions, respondent fails to provide record citations or exhibit numbers for the video and a photograph of the jeans Appellant was wearing when he was arrested, which would enable this court to evaluate the evidence.  This court has reviewed the video that appears to be referenced in the testimony—labeled "Pacific Ave" and showing the presumed assailants from behind—and this court was unable to make out any horseshoe stitching on any back pockets. Finally, respondent cites to no evidence regarding how common such jeans were among Western Addition gang members at the time.

Respondent argues the trial court relied on "corroborating evidence that [Appellant's] cell phone was in the area."[15]  At the state trial, there was testimony a cell phone used by Appellant was in the general vicinity of the Barrett murder around the time of the murder.  In particular, at 12:37 a.m.

---

[14] Respondent asserts that David S. "told police four or more times that he really didn't see the shooter's face."  What David S. told the police was that he was focused on the "commotion" and the shooter's gun and clothes, but in his first phone call with the investigators he also told them he got "a pretty good look at" the shooter.

[15] Respondent asserts the cell phone "followed the presumed path of the getaway car's escape," but it provides *no* record citations to support that assertion.

and 12:52 a.m. on November 25, 2008, the phone was used in a sector covered by a cell tower three blocks from the site of the murder and in a sector covered by different cell tower at 12:54 a.m.[16]  A police officer testified that "right around" 1:00 a.m. on November 25, he was stopped while on patrol by an individual (subsequently identified as Duane R.) who said there had "just" been a shooting at Broadway and Kearny.  The cell phone location evidence, as well as evidence linking the phone to Appellant, is evidence that Appellant *may have been* somewhere in a relatively large area including the location of the murder.[17]  But it provides only slight corroboration for Francis S.'s testimony Appellant was the shooter.[18]

Finally, respondent points to the evidence that Appellant was involved in other robberies of expensive pieces of jewelry from individuals.  In particular, there was wiretap evidence that, four months before the murder,

---

[16] On its own motion, this court takes judicial notice of the locations of streets in San Francisco.  (Evid. Code, § 452, subds. (g), (h).)

[17] The testimony made clear each tower sector covers an area encompassing many blocks, and the cell phone evidence was not admitted for the purpose of showing the "precise location of the phone."  (*People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1197; see also *id.* at p. 1199 [testifying detective "did not purport to know the location of defendant's cell phone with any degree of precision"].)  Respondent cites to nothing in the record "defin[ing] the coverage area" of the relevant cell tower (*id.* at p. 1197), which further limits this court's ability to give significant weight to the evidence.

[18] Appellant asserts that cell tower evidence is "unreliable junk science," citing to a 2012 law review article and a 2012 Illinois federal district court decision.  However, he cites no California case authority or evidence in the record supporting that assertion. (See *People v. Garlinger*, *supra*, 247 Cal.App.4th 1185 [trial court did not err in admitting expert testimony regarding cell tower evidence].)

Appellant spoke to another person about strong-arm robberies and buying and selling jewelry.  There was evidence that Appellant robbed Reginald T. at gunpoint in December 2008 outside a club, taking a valuable pendant and watch, and other items.  Although such evidence suggested the Barrett attempted robbery was the type of crime Appellant had committed, it provides little if any corroboration for Francis S.'s identification of Appellant as the shooter.

D.    *Conclusion*

Sergeant Jackson's powerful testimony exculpating Appellant is sufficient to overcome the testimony of Francis S. and any evidence corroborating it.  Because Appellant proved he was not one of the assailants and specifically not the shooter by a preponderance of the evidence, and respondent has articulated no other ground to affirm the murder and attempted robbery charges, the trial court erred in denying Appellant's section 1485.55, subdivision (b) motion for a finding of factual innocence.

On remand, the trial court is directed to grant Appellant's motion and to determine the period of " 'unlawful[] imprison[ment]' " in accordance with *People v. Etheridge* (2015) 241 Cal.App.4th 800, 810.  To determine the period of unlawful imprisonment, the trial court may consider any appropriate factors, including the effect of any federal hold or sentence on the federal charges that followed Appellant's state trial.

## DISPOSITION

The trial court's order is reversed.  On remand, the trial court is directed to grant Appellant's motion and to determine what period of unlawful imprisonment Appellant was subjected to, in accordance with this decision.

_____
SIMONS, J.

We concur.

_____
JACKSON, P. J.

_____
BURNS, J.

(A161599)